## UNITED STATES v. BALABAN et al.
### No. 31230.

District Court, N. D. Illinois, E. D.
Feb. 17, 1939.

William J. Campbell, U. S. Dist. Atty., of Chicago, Ill., Thurman Arnold, Asst. Atty. Gen., and Robert L. Wright, Sp. Asst. to Atty. Gen., for plaintiff.

Weymouth Kirkland, Robert N. Golding, and Thomas M. Thomas, all of Chicago, Ill., for defendants Paramount Pictures, Inc., Balaban & Katz Corporation, B. & K. Management Corporation and Barney Balaban.

Mayer, Meyer, Austrian & Platt, of Chicago, Ill., for defendant Loew's, Inc.

Spitz & Adcock, of Chicago, Ill., for defendants RKO Radio Pictures, Inc., and Universal Film Exchanges, Inc.

Dwight, Harris, Koegel & Caskey, of New York City, for defendant Twentieth Century-Fox Film Corporation.

Sonnenschein, Berkson, Lautmann, Levinson & Morse, of Chicago, Ill., for defendant United Artists Corporation.

Defrees, Buckingham, Jones & Hoffman, of Chicago, Ill., for defendants Warner Bros. and Vitagraph, Inc.

WOODWARD, District Judge.

The information charges the defendants with criminal contempt for a wilful disobedience of the injunctive decree of this court entered April 6, 1932. An order to show cause was entered. Before responding to the order to show cause the defendants appeared and severally, with the exception of Vitagraph, Inc., and Warner Bros. Pictures, Inc., and moved the Court for an order requiring the Government to furnish the defendants a bill of particulars.

The information avers that the defendants Balaban & Katz Corporation and B & K Management Corporation are exhibitors of motion picture films in what is known in the motion picture trade as the Chicago Exchange Territory and in the Chicago first run zone. The other defendants, except Barney Balaban, are distributors of motion picture films throughout the United States, having exchanges located at Chicago, Illinois, from which films are distributed to the defendant exhibitors. Barney Balaban is the President and director of the defendant exhibitors as well as of Paramount Pictures, Inc., one of the distributor defendants.

The Chicago Exchange Territory embraces the entire State of Illinois, the northern part of Indiana, the southern part of Wisconsin and the northeastern part of Missouri. For the purpose of the distribution and exhibition of motion picture films the country is divided into zones, known as Metropolitan zones, for first run exhibitions. These zones include and surround key cities in which one or more large, modern, well-equipped motion picture theatres are operated. The Chicago first run zone, or Chicago zone, includes all of Cook, Lake and DuPage Counties, Illinois, and Lake County, Indiana. First run pictures, also called first class feature pictures, or feature pictures, are those produced by the aid of expert directing and acting talent, with expert technical assistance, having a minimum length of five reels, the first run, or continuous first run, of which in first class motion picture theatres will attract a substantial attendance at the maximum admission price. In licensing films for exhibition the distributor, by contract with the exhibitors, designates the relative dates on which the various theatres within the zone shall be permitted to play the given film. These are what is known as first run, continued first run, second run, third run, etc., exhibitions. There may be nine or ten runs before the final run in the zone. The first run, of course, is the initial exhibition of the film. A continued first run is that part of the initial exhibition in the first run zone which occurs in a second theatre immediately following its exhibition in the first theatre. The second and subsequent runs is the exhibition of a film in theatres of the same zone succeeding the initial exhibition. An interval, usually at least seven days, elapses between a first run or a continuous first run and the second run, and a like interval between the second and subsequent runs. The information defines clearance as the method by which first run zones and the respective playing positions of theatres within those zones are established. Being further amplified, it includes the interval or lapse of time which the producer or distributor, as licensor, fixes

and determines shall occur between the first and second runs, and the second, third and other runs. In other words the licensor promises the first run exhibitor that a given film will not be exhibited elsewhere in the zone for a given number of days after the preceding run. This is denominated clearance or protection. When clearance is granted on a competitive basis, the first run priority of feature pictures is granted to the theatres which, by virtue of superior size, equipment and location are best able to secure the largest total admission price for the period of the run. Any other clearance is arbitrary or unreasonable.

The motion picture season commences September 1 and closes August 31 next succeeding.

An affiliated exhibitor is a firm or corporation engaged in the exhibition of motion pictures which is owned, operated or controlled, directly or indirectly, by a producer or distributor of motion picture films. An unaffiliated exhibitor is one engaged in the operation of a motion picture theatre with which neither a producer nor a distributor has any connection. In other words, he is an independent exhibitor.

The theatres in the Chicago loop which have the equipment, seating capacity and location for the exhibition of first class feature pictures on a first run in the Chicago zone are as follows, ranked according to seating capacity:

| Name. | Seating Capacity. | Operator. |
|---|---|---|
| (1) Chicago | 3,900 | B. & K.—Paramount |
| (2) Oriental | 3,200 | None. |
| (3) Palace | 2,700 | R. K. O. |
| (4) State-Lake | 2,500 | Unaffiliated |
| (5) McVickers | 2,300 | ½ B&K—Paramount ½ Unaffiliated |
| (6) United Artists | 1,700 | B. & K.—Paramount |
| (7) Roosevelt | 1,500 | B. & K.—Paramount |
| (8) Apollo | 1,200 | B. & K.—Paramount |
| (9) Woods | 1,100 | Unaffiliated |
| (10) Garrick | 1,000 | B. & K.—Paramount. |

It will be noted that the State-Lake and Woods are unaffiliated; McVickers is one-half unaffiliated and Oriental is closed. The other loop theatres are all affiliated theatres.

The defendant distributors control the exhibition in the Chicago Exchange Territory of approximately 90% of first run pictures produced in the United States. No Chicago motion picture exhibitor could fill the playing time of a first run theatre in the Chicago loop with feature pictures obtained from other exhibitors. In order that the unaffiliated motion picture exhibitors operating in the Chicago loop could secure first run films it would be necessary for them to have access to a substantial number of first run films distributed by one or more of the defendant distributors.

Neither the State-Lake nor the Woods theatres have been able to secure films for first run exhibition. Exhibitors who have sought to lease the Oriental have been systematically excluded from that privilege. During the current and last two motion picture seasons the State-Lake has been forced to play in third run and the Woods to play in fourth run. The McVickers, partly affiliated and partly unaffiliated, operates as a second run theatre. All the other loop motion picture theatres above referred to, and all affiliated, are operated as first run theatres. The pictures distributed by the defendants RKO Pictures, Inc., and Universal Film Exchanges, Inc., are shown at the Palace. RKO Radio Pictures, Inc., licenses all of its first run pictures to be run at the Palace, and has not placed its first run films on the market. Universal Film Exchanges, Inc., has granted the exclusive privilege of showing its first run pictures to the Palace. All the other first run films distributed by the remaining defendant exhibitors during the current and past two motion picture seasons have been exhibited at the Chicago, United Artists, Roosevelt, Apollo and Garrick theatres, all operated by the defendant exhibitors.

The defendant Barney Balaban, by virtue of his official position as President and director of Paramount Pictures, Inc., Balaban & Katz Corporation and B & K Management Corporation, has actively participated in the maintenance of first run films to the motion picture films to the theatres above named. Besides, the information charges, he has a personal interest in the maintenance of such first run monopoly. Balaban owns or controls the principal interest in the Roosevelt Theatre Building in which the Roosevelt Theatre is located. The building is leased by the defendant exhibitors at $5,000 per week. In order to justify such rental, the information charges, the defendant distributors have been forced by Balaban to permit first run pictures to be played there which would ordinarily be entitled to a first run showing in a larger theatre.

The Oriental Theatre was completed in 1925 as part of a loop office building for the express purpose of showing first run motion pictures. It was leased for a term of fifty years to Balaban & Katz Corporation. Balaban & Katz Corporation played first run motion pictures in that theatre until 1934, when it was reduced to a second run theatre. It continued to operate as a second run theatre until February, 1938, when Balaban & Katz Corporation defaulted on its lease. The theatre was closed in April, 1938, and still remains closed. The owner of the building and equipment has been unable to lease the building and equipment on terms which will yield an adequate return on the investment because unaffiliated exhibitors who have sought to lease it cannot obtain first run, continued first run or second run motion pictures from the defendant distributors for the current motion picture season. No affiliated exhibitor other than the defendant exhibitors has offered to lease the building and equipment. The owner is reluctant, because of past experience, to re-lease the building to the Balaban & Katz Corporation.

The information then charges that the defendants collusively, collectively or by concert or agreement have combined and conspired to do all the acts set forth in the information, and other acts in furtherance of the combination and conspiracy, all in violation of the decretal order of this Court.

By a consent decree entered by this Court on April 6, 1932 the defendants therein named were enjoined from doing certain acts hereinafter more particularly described.

Paragraph VII of the decree enjoined the defendants, or by concert or agreement, from, among other things:

"(a) Restricting the course of interstate trade and commerce in motion picture films distributed by defendant distributors for first run exhibitions in the territory served by the Chicago Exchanges and for first and second suburban run exhibitions in the City of Chicago, Illinois, to motion picture theatres managed or booked by any one or more of defendant exhibitors.

"(b) Preventing unaffiliated exhibitors of motion pictures in the Chicago Exchange Territory from contracting for or from securing in the course of interstate trade and commerce any motion picture film or films suitable for first run exhibition or first or second suburban run exhibition in any city or town in the territory served by the Chicago Exchanges in which any one of the defendant exhibitors operates or books one or more motion picture theatres.

\* \* \* \* \* \*

"(g) Granting to motion picture theatres, owned, operated, or controlled by defendant exhibitors in the territory served by the Chicago Exchanges, arbitrary or unreasonable protection or clearances over competing theatres owned, operated, or controlled by unaffiliated exhibitors."

Paragraph VIII of the decree enjoined the defendant exhibitors and any two or more of them, and their officers and directors, from coercing or compelling or attempting to coerce or compel defendant distributors, their officers, agents, or employees, with the intent, for the purpose, or with the effect of accomplishing the performance of any of the acts enjoined by Paragraph VII (a), (b), and (g).

Paragraph IX of the decree enjoined all of the defendants and any two or more of them, and their officers from preparing, publishing, adopting, enforcing, or attempting to enforce any uniform plan, system, or schedule of zoning or clearance with the intent, for the purpose, or with the effect of accomplishing the performance of any of the acts enjoined in Paragraph VII (a), (b), and (g).

Paragraph X of the decree enjoined the defendant exhibitors and their officers from entering into or performing any contracts, agreements, franchises, or licenses with any one or more of the defendant distributors for the exhibition of motion pictures in the Chicago area, the individual or collective effect of which would unreasonably lessen competition in interstate trade and commerce between the defendants or any two or more of them, or effect a combination in unreasonable restraint of interstate trade and commerce in motion pictures in the Chicago territory.

Paragraph XI (b) of the decree enjoined all of the defendants and any two or more of them, and their officials, from collusively, collectively, or by concert or agreement between them, formulating, adopting or practicing a policy with respect to the city of Chicago whereby the defendant exhibitors obtain the exclusive first choice of motion pictures distributed

by defendant distributors in the Chicago exchange territory with the purpose or effect of preventing unaffiliated exhibitors from securing films for exhibition in such territory.

The information, by apt language, avers that the present defendants are bound by the decree.

The information then charges that the defendants have violated such orders of the Court. The charges of such violations are set forth in Division III of the information and are as follows:

"1. For the past three years the defendants named herein, acting collusively, collectively, or by concert or agreement, have restricted the course of interstate trade and commerce in motion picture films distributed by the defendant distributors for first run exhibitions in the city of Chicago, Illinois, to motion picture theatres managed or booked by the defendant exhibitors.

"2. For the past three years the defendants named herein, acting collusively, collectively, or by concert or agreement, have prevented unaffiliated exhibitors of motion pictures in the city of Chicago from contracting for or from securing in the course of interstate trade and commerce any motion picture film or films suitable for first run exhibition in said city of Chicago, wherein the defendant exhibitors operate numerous motion picture theatres.

"3. For the past three years the defendants named herein, acting collusively, collectively, or by concert or agreement, have granted to motion picture theatres owned, operated, or controlled by the defendant exhibitors in the city of Chicago arbitrary or unreasonable protection or clearance over competing theatres owned, operated, or controlled by unaffiliated exhibitors.

"4. For the past three years the defendants named herein, have prepared, published, adopted, enforced or attempted to enforce, a uniform plan, system, or schedule of zoning and clearance with the intent, for the purpose, or with the effect of accomplishing the acts referred to in paragraphs 1, 2 and 3 above.

"5. The defendant exhibitors have for the past three years entered into and performed certain contracts, agreements, franchises or licenses with each of the defendant distributors (except the defendants RKO Radio Pictures, Inc., and Universal Film Exchanges, Inc.) for the exhibition of motion pictures in the Chicago exchange territory, the individual or collective effect of which has unreasonably lessened competition in interstate trade and commerce between the defendants named herein and which will unreasonably lessen competition in interstate trade and commerce between said defendants and which have effected or will effect a combination in unreasonable restraint of interstate trade and commerce in motion pictures or which has created or will create a monopoly of interstate trade and commerce of motion pictures in said territory.

"6. For the past three years the defendants named herein have collusively, collectively, or by concert or agreement between them, formulated, adopted or practiced a policy with respect to Chicago whereby the defendant exhibitors obtain the exclusive first choice of motion pictures distributed by the defendant distributors (except RKO Radio Pictures, Inc., and Universal Film Exchanges, Inc.) in the Chicago exchange territory, with the intent or purpose of preventing unaffiliated exhibitors from securing films suitable for first-run exhibition in Chicago.

"7. The defendants, Barney Balaban, Balaban & Katz Corporation, B & K Management Corporation, and Paramount Pictures, Inc., have, for the past three years, coerced and compelled, or attempted to coerce and compel, all of the other defendant distributors, their officers, agents and employees, with the intent or for the purpose, or with the effect of accomplishing the performance of the acts described in the foregoing paragraphs numbered 1, 2, 3, 4, 5, and 6 above."

The charges of the violation of the decree are made in general and indefinite language. It is said, however, that the specifications found in paragraphs 8 to 46, both inclusive, of Division III, of the information contain the details and particulars of the charges found in paragraphs 1 to 7, inclusive. Omitting all superfluous and argumentative matters contained in paragraphs 8 to 46, inclusive, the specifications of the charge may be summarized as follows:

(1) State-Lake and Woods, unaffiliated theatres, have been systematically excluded from first run exhibitions. (Par. 23.)

(2) Unaffiliated exhibitors who have sought to lease the Oriental for first-run films have been systematically excluded from that privilege. (Par. 23.)

(3) First run films distributed by Radio Pictures, Inc., have been exhibited exclusively at the Palace. (Par. 24.)

(4) First run films distributed by Paramount Pictures, Inc., have been exhibited at the Chicago, United Artists, Roosevelt, Apollo or Garrick Theatres. (Par. 25.)

(5) Uniform clearance and zoning agreements, made and enforced by the defendants, exclude unaffiliated exhibitors from securing first run films for exhibition at the Oriental, State-Lake and Woods, and limit first run clearance to the Chicago, United Artists, Roosevelt, Apollo and Garrick, except those shown at the Palace. (Par. 27.)

(6) Such uniform clearance agreements force the Oriental to play in second run, the State-Lake to play in third run and the Woods to play in fourth run. (Par. 28.)

(7) Such uniform clearance agreements ignore the natural competitive advantages possessed by the Oriental, State-Lake and Woods theatres over certain theatres operated by the defendant exhibitors. (Par. 29.)

(8) The Oriental, State-Lake and Woods have been excluded from securing first run pictures on account of franchise agreements made by the defendants, which provide that the defendant exhibitors shall have the exclusive right to select first run films from all the feature pictures distributed by each of the defendant distributors, except RKO Radio Pictures, Inc., and Universal Film Exchanges, Inc. (Par. 30.)

(9) The RKO Pictures, Inc., has not placed its first run pictures on the market, as they are exhibited solely at the Palace. (Par. 31.)

(10) Universal Film Exchanges, Inc., has granted the exclusive privilege of exhibiting first run films distributed by it to the Palace. This is accomplished by means of franchise agreements. (Par. 31.)

(11) By means of the uniform franchise agreements and the uniform policy of the defendant distributors, the defendants have prevented unaffiliated exhibitors from securing suitable first run films from the defendant distributors no matter whether they offer more rental than the defendant exhibitors offer therefor and regardless of the superiority of certain theatres operated by such unaffiliated exhibitors over certain of those operated by the defendant distributors. (Pars. 32, 33.)

(12) The franchise agreements have compelled the defendant distributors, in licensing first run films, to disregard the normal competitive advantages possessed by the unaffiliated theatres over the affiliated first run theatres, thus unreasonably lessening competition and effecting a combination in restraint of trade. (Par. 37.)

Other particulars are noted in some of the paragraphs not hereinabove adverted to, and, for present purposes, may be ignored. An examination of the specifications of detail disclosed in paragraphs 8 to 46, inclusive, discloses that many of such specifications are as general and uncertain in particularity as are the main charges.

The defendants, therefore, have interposed their several motions for bills of particulars, not only as to the main charges made in Division III, paragraphs 1–7, inclusive, but also as to certain vague and general allegations made in subsequent paragraphs of the information.

The books contain few cases in which bills of particulars have been granted in contempt proceedings. In fact, counsel have referred the Court to only three cases in the Federal Courts in which bills of particulars in contempt cases have been adverted to. But the paucity of decision is not conclusive that such bills of particulars, in contempt cases, cannot, in the exercise of a sound judicial discretion, be required. The analogy between a proceeding in criminal contempt and an indictment for a criminal offense is so compelling as to leave no doubt that, in a proper case, a bill of particulars may be exacted. As a contempt proceeding is so strongly analogous to that of a criminal proceeding, the rules applicable to criminal cases may, with propriety, be followed.

The information charges a constructive contempt—a criminal contempt. While a proceeding for criminal contempt is sui generis, yet it partakes of the essential features of a criminal prosecution. The information now before the Court charges a wilful violation of a valid order or decree of this Court, but the charges therein made constitute also crimes under the laws of the United States. With immaterial exceptions, the method of criminal procedure should be adhered to in criminal contempt proceedings. In a proceeding for criminal contempt the presumption of innocence must be applied.

The burden is on the government to prove the guilt of the defendants beyond a reasonable doubt. There is no shifting of the burden of proof. The defendants cannot be compelled to testify against themselves. Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 444, 31 S.Ct. 492, 55 L.Ed. 797, 34 L.R.A.,N.S., 874. The information is not required to conform to the precision and nicety of an indictment. While there is no fixed formula, the pleading is sufficient if the defendants are clearly informed of the charges they are required to meet. The defendants are entitled to be apprised of the nature and particulars of the charge, "and so clearly and definitely as not only to show prima facie a case against them, but that when arraigned they might know what answer to make and to enable them to prepare their defense. * * *" Sona v. Aluminum Castings Co., 6 Cir., 214 F. 936, 939.

It is unnecessary to discuss at length the fundamental principles governing the granting or withholding of a bill of particulars. The facts and circumstances of each particular case must be considered. Fundamentally the defendants have a right to be advised of the time, place and nature of the acts complained of. Courts have been liberal in granting motions for bills of particulars. Judge Ward, in the case of Locker v. American Tobacco Co., D.C., 200 F. 973, at page 975 said: "Bills of particulars have grown from very small and technical beginnings into most important instruments of justice. * * * While they are not intended to advise a party of his adversary's evidence or theory, they will be required, even if that is the effect, in cases where justice necessitates it."

The charges made in the information seem to demand that the Government shall furnish the defendants with a bill of particulars. The essential and relevant charges of a violation of the injunction are made in Division III, paragraphs 1 to 7, inclusive. These charges are direct, explicit and unequivocal. The information will stand the test of a demurrer. But the charges made in paragraphs 1 to 7, inclusive, are so general as not to advise either the defendants or the Court of the specific acts which go to make up the conspiracy. Necessarily the evidence to be adduced will involve much detail. The wealth and complexity of detail in the trial of an anti-trust case will, unless the issues are clearly defined, tend to confusion. It follows, therefore, that the issues should be developed clearly and simply. The fundamental issues should be developed at the outset. In other words, at the outset the points in controversy should be defined with reasonable certainty. They should be developed so as fairly and properly, in a reasonable and common sense way, to produce in Court a full and complete disclosure of all the facts. The orderly and reasonably expeditious presentation of the evidence demands that the evidence be confined within a reasonable compass.

Referring to Division III, paragraphs 1–3, inclusive, and paragraph 6, the fundamental facts to be established by the government are: (1) The unlawful conspiracy or agreement; and (2) the acts done in connection therewith. The offense charged is an unlawful agreement. What that agreement is should be made absolutely clear. The defendants should be apprised in what respect they acted unlawfully, in what manner they combined, and the nature and content of the agreement.

Referring to Division III, paragraphs 4, 5, inclusive, and paragraph 7, the defendants are charged with doing certain acts with a specific intent and having a specific effect. The acts charged to have been done in any of the paragraphs above referred to are stated in the most general and comprehensive language.

What constitutes these unlawful agreements and the acts done in connection therewith should be stated with reasonable particularity and with greater certainty than is found in the information.

A bill of particulars should be furnished to define the issues more clearly, to expedite the trial and to promote the ends of justice.

As applied to this case the nature of the particulars to be supplied is set forth in the order which is filed herewith.

At the time the rule to show cause was entered the plaintiff filed a petition for subpoena duces tecum, returnable the same day the rule was returnable, to the several defendants and to others commanding the production of voluminous documents. The Court granted the ex parte application and ordered the subpoena duces tecum to issue. Motions to quash the respective subpoenas duces tecum are now

pending for a ruling. Various grounds are set forth in support of the motions.

 The Court is of the opinion that the order for the subpoenas duces tecum was improvidently granted and the respective motions to quash will be sustained.

Passing over the infirmity of the petition for the order, which is strenuously urged in the respective motions to quash, there is another compelling reason why the respective motions should be granted.

In a criminal contempt case an orderly procedure is usually followed. The government has filed an information charging the defendants with a violation of the decretal order of this court, and prayed that an order be entered requiring the defendants to show cause why they should not be attached and punished for contempt. Upon filing the information the Court entered a rule to show cause. Upon the return day of the rule, the defendants interposed their respective motions for a rule on the government to furnish bills of particulars. The Court has granted these motions in part and has extended the time to show cause. When the bill of particulars shall have been filed and the defendants shall have answered the information, then, and not until then, shall an issue have been formed. While the matter has not been argued by either party, yet the Court understands that this proceeding is under Sections 21 and 22 of the Clayton Act (28 U.S.C.A. §§ 386, 387). Hill v. United States ex rel. Weiner, 3 Cir., 84 F.2d 27. If so, then the defendants, upon their demand, are entitled to a jury trial. It is not until the trial stage is reached, whether the trial be before the Court or before a jury, that evidence can be received. The scope of the evidence depends upon the issues formed by the information, the bill of particulars and the response of the defendants. Until issues are formed, by a return to the rule, it is not known what evidence will be competent, relevant or material. The bill of particulars which the government will furnish under the rule this day entered will probably greatly narrow the issues and make unnecessary the great volume of books, documents and papers which are obviously asked to be produced.

The government also avers that the papers, books, documents and records produced pursuant to the subpoenas duces tecum be impounded. The subpoenas duces tecum having been quashed, necessarily this motion must fall. There are no documents to impound.

### Order.

Motions for bills of particulars having been made by the several respondents to the information filed herein and said respective motions having come on to be heard and after hearing counsel for said respective respondents and counsel for the United States of America in opposition thereto, and the Court after hearing arguments of counsel and after considering written suggestions filed by counsel for certain of said respondents and by counsel for the United States of America, and the Court thereafter having rendered and filed its opinion:

It is ordered that the complainant, United States of America, on or before sixty days from the date hereof, file in this cause a bill of particulars of the matters embraced within the information and setting forth in detail the following:

Division III, Par. 1:

 (1) When and with respect to what theatres, if any, such restriction occurred and the means by which such restriction was effected;

(2) The time when such agreement was entered into or when said concerted, collusive or collective act was taken;

(3) The place where each such agreement was entered into or the place where each such concerted, collusive or collective act took place;

(4) The names of the parties to each such agreement and the names of the parties present in each such concerted, collusive or collective act; and

(5) Whether any such alleged agreement was oral or in writing; if oral, the substance thereof.

Division III, Par. 2:

 (1) State whether the restriction of the course of interstate trade occurred only in connection with films suitable for first run exhibition or whether it occurred in connection with other films; if so, what others and whether such restriction occurred only in connection with the ten theatres named or if it occurred in other theatres and, if so, what others; and

(2) State which unaffiliated theatres were prevented from contracting for or securing motion picture film and with respect to which theatres and what, if any, particular films.

Division III, Par. 3:

█ State in what way protection or clearance alleged to have been granted was arbitrary or unreasonable, and with respect to which theatres of unaffiliated exhibitors, and with respect to which theatres of defendant exhibitors such clearance was arbitrary or unreasonable.

Division III, Par. 4:

█ (1) Furnish a copy of the uniform plan, system or schedule of zoning and clearance; and

(2) State whether or not such plan, system or schedule of zoning and clearance was enforced by any method than that prescribed in Par. XIII of the final decree.

Division III, Par. 5:

█ State in what respect there has been an unreasonable lessening of competition and in what respect and to what extent there has been an unreasonable restraint of trade and in what respect and to what extent there has been the creation of a monopoly and the means and methods by which each is contended to have been effected and what, if any, unaffiliated theatres it is claimed have been affected thereby.

Division III, Par. 6:

█ . Give the names of unaffiliated exhibitors, if any, who have been prevented from securing motion picture films, the time when they were so prevented and which particular defendant refused to furnish motion picture films and to which particular unaffiliated exhibitor or exhibitors motion picture films have been refused and when.

Division III, Par. 7:

█ The means and methods claimed to have been employed by the defendants to effect the coercion and compulsion or attempt the coercion and compulsion of the defendant distributors, their officers and agents and with respect to each act so specified which of the defendants Barney Balaban, Balaban & Katz Corporation, B. & K. Management Corporation and Paramount Pictures, Inc., claimed to have committed said act.

Division III, Par. 21:

█ With respect to the fourth sentence, state the name of the unaffiliated exhibitor from which of the defendants said exhibitor requested and was refused first class films, when such request or requests were made and refused.

Division III, Par. 23:

█ (1) With respect to the Oriental Theatre, state the names of the unaffiliated exhibitors who have sought to lease said theatre and, with respect to each such exhibitor, the details of such attempt to lease said theatre, namely, the terms offered by the exhibitor, the terms demanded by the lessor and, if any such offer or refusal was in writing, then set forth a copy of each such writing; and

█ (2) State the name of each unaffiliated exhibitor claimed to have been excluded from first run exhibition at the State-Lake and Woods Theatres.

Division III, Par. 27:

█ Give a copy of all uniform clearing and zoning agreements relied upon.

Division III, Par. 28:

█ Give a copy of all uniform clearing and zoning agreements relied upon.

Division III, Par. 30:

█ Give a copy of all franchise agreements relied upon.

Division III, Par. 33:

█ Specify the following:
(1) The names of the unaffiliated exhibitors prevented from securing films suitable for first run exhibition in the Chicago zone;

(2) The names of the unaffiliated exhibitors who have offered more rental for such films than the defendant exhibitors;

(3) With respect to each such offer, the date or dates thereof, the name of the person to whom each such offer was made and the terms thereof.

Division III, Par. 38:

█ Give the names of the unaffiliated exhibitors who have been excluded from first run exhibitions, the names of the theatres operated by them, respectively, and the time or times when such exclusion occurred.

Division III, Par. 40:

█ Specify the specific acts that are claimed to have constituted a forcing, compelling, or coercing of any defendant distributor by the defendant Barney Balaban, and the specific pictures therein referred to which it is claimed were entitled to a first run showing in a larger theatre and the reasons why each of such pictures was so entitled.

Division III, Par. 45:

Give the same information as is required herein to be given as to Division III, Par. 23.

Division III, Par. 52:

█ Specify each other act or acts in furtherance of the alleged combination and conspiracy it is claimed to have been committed.

It is further ordered that, except as hereinabove allowed, the said respective motions for bills of particulars are denied.

It is further ordered that the time within which each defendant shall make return to the rule to show cause be and the same is hereby extended to a day which is twenty days from the day on which the plaintiff serves upon the attorneys for the respective defendants a copy of the bill of particulars herein required.