**BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN et al., Appellants,**

v.

**UNITED STATES of America, Appellee.**

No. 23622.

United States Court of Appeals Fifth Circuit.

May 2, 1969.

son, Elson, Lassers & Wolff, Chicago, Ill., Harold C. Heiss, Donald W. Bennett, Heiss, Day & Bennett, Cleveland, Ohio, for appellants

John B. Miller, Savannah, Ga., Charles J. Bloch, Wilbur D. Owens, Jr., Macon, Ga., L. J. Bennet, Brunswick, Ga., James H. Wilson, Jr., Atlanta, Ga., for appellee; Sutherland, Asbill & Brennan, Atlanta, Ga., of counsel.

Edwin L. Weisl, Jr., Asst. Atty. Gen., John C. Eldridge, Walter H. Fleischer, Attys., Dept. of Justice, Washington, D. C., for amicus curiae.

Before JOHN R. BROWN, Chief Judge, AINSWORTH and GODBOLD, Circuit Judges.

JOHN R. BROWN, Chief Judge:

### CONTEMPT

This is more fallout from Award 282 and the running, ceaseless, undulating controversy between the Brotherhood of Firemen and the Carriers over unneeded firemen on diesel railroad engines. The twist here is that this appeal tests the correctness of a judgment of criminal contempt against the Brotherhood,[1] four subordinate local lodges, and various national and local Brotherhood officials in both their representative and individual capacities. The fines levied, varying from $2,500 to $25,000,[2] were payable to the United States.[3]

Ralph L. Crawford, John R. Calhoun, Savannah, Ga., Aaron S. Wolff, Alex El-

1. Brotherhood of Locomotive Firemen and Enginemen (BLFE).

2. The judgment of conviction sentenced respondents to pay to the United States:
 1. A fine of $25,000.00 jointly against BLFE and against R. L. McCollum, National Vice President of BLFE, and against A. B. Healan, General Chairman of BLFE, in their capacity as officers and representatives of said Brotherhood,
 2. A fine of $2,500.00 against R. L. McCollum, individually,
 3. A fine of $2,500.00 against A. B. Healan, individually,
 4. A fine of $2,500.00 jointly against Local Lodge No. 714 of the Brotherhood of Locomotive Firemen and Enginemen, and J. T. Hartley and O. C. Hall in their capacities as officers and representatives thereof,

 5. A fine of $2,500.00 jointly against Local Lodge No. 724 of the Brotherhood of Locomotive Firemen and Enginemen, and against H. O. Eiland, J. O. Landrum, and W. S. Bryant in their capacities as officers and representatives thereof.
 6. A fine of $2,500.00 jointly against Local Lodge No. 801 of the Brotherhood of Locomotive Firemen and Enginemen, and J. W. Perkins in his capacity as an officer and representative thereof.

 The imposition of sentences against Defendants J. T. Hartley, O. C. Hall, H. O. Eiland, J. O. Landrum, W. S. Bryant and J. W. Perkins in their individual capacities were suspended, and said individual defendants were placed on probation for a period of five years.

3. The order entered April 5, 1966, and presumably drafted by the District Court,

The contempt grew out of alleged violation of a temporary restraining order of March 31, 1966, issued by the District Court in Georgia. The immediate facts out of which it grew are set out in the appeal on the merits, this day decided.[4] The full background is reflected in the opinions of the District of Columbia Circuit.[5] The appeal by respondents levels two principal attacks—first, the denial of a jury trial, and second, lack of due process. Since we conclude that the criminal contempt proceedings lacked the rudiments of due process, we reverse without deciding the jury issue.

As the history reflects, the temporary restraining order allegedly violated was a duplicate, unneeded order. On the eve of expiration of Award 282, (12:01 a. m. March 31) the Nation's Class I railroads on March 24, 1966, filed suit in the United States District Court for the District of Columbia [6] seeking declaratory and injunctive relief. On March 28, 1966, Judge Holtzoff, of that Court, issued a temporary restraining order against BLFE prohibiting a strike upon the expiration of the Award. Subsequently, on March 31, Judge Holtzoff expanded his restraining order to cover any strikes in any way relating to the Award. In the meantime, back on the tracks at 12:01 a. m. on Thursday, March 31, 1966, BLFE initiated a strike against the Carriers (including Georgia Central).[7]

Notwithstanding the sweeping injunction in their favor against BLFE and all of its components issued by Judge Holtzoff, on that very day, Thursday, March 31, 1966, Georgia Central and Southern sought identical injunctive relief against BLFE and its components in the United States District Court for the Southern District of Georgia. The District Court in Georgia issued ex parte a temporary restraining order on Thursday, March

not counsel, prescribed that these fines (note 2 *supra*) are "levied against [defendants named] in favor of complainants [Georgia Central and Southern] in equal shares." The next day, April 6, the Court entered a much more detailed order, presumably drafted by counsel since it recites that "upon suggestion of the attorneys for the United States * * * this Court does hereby revise and amend its order * * * of April 5, 1966." It included Findings of Fact, levied identical fines but prescribed payment "to the United States."

4. No. 23815, Brotherhood of Locomotive Firemen and Enginemen v. Central of Georgia Railway Co., 5 Cir., 1969, 411 F.2d 320. We there vacate the preliminary injunction and remand for transfer of the whole case to the District of Columbia Courts.

5. As in the merits opinion (note 4 *supra*) we identify them with [1] [2] brackets:

Opinion [1] (Merits):

Brotherhood of Railroad Trainmen v. Akron & Barberton Belt R.R., 1967, 128 U.S.App.D.C. 59, 385 F.2d 581, cert. denied, 1968, 390 U.S. 923, 88 S.Ct. 851, 19 L.Ed.2d 983.

Opinion [2] (Contempt):

Brotherhood of Locomotive Firemen and Enginemen v. Bangor & Aroostook R.R., 1967, 127 U.S.App.D.C. 23, 380 F.2d 570, cert. denied, per curiam, 389 U.S. 327, 88 S.Ct. 437, 19 L.Ed.2d 560.

The Court vacated its prior order denying certiorari and entered a new order denying the writ on the ground that the case was not yet ripe. Mr. Justice Black would have granted the petition.

Opinion [3] (Union Representation):

Brotherhood of Locomotive Firemen and Enginemen v. National Mediation Board (No. 22050); and National Mediation Board v. Brotherhood of Locomotive Engineers, D.C.Cir., 1969, 410 F.2d 1025 [March 14, 1969]. This sequel concerns the internecine intramural, probably non-fraternal dispute between the two Brotherhoods as to which gets the Apprentice Engineer craft and the dilemma facing the Carriers in recognition and bargaining. With the collective apologia of the Court's principal spokesman Judge J. Skelly Wright, and special sentiments of Juges Burger and Tamm, the Court may itself be giving its decision the characterization that it is bound to be right because it is so wrong in result. See Gulf Oil Corp. v. Panama Canal Co., 5 Cir., 1969, 407 F.2d 24, 26; Lawrence v. United States, 5 Cir., 1967, 269 F.2d 452, 467.

6. This case, Bangor & Aroostook, is the lead citation to the contempt case, Op. [2], note 5 *supra*. See note 5, merits opinion.

7. Southern was affected in that some of its personnel would not cross Georgia Central picket lines.

31, 1966. This order is at the bottom of this Georgia *criminal* contempt.[8]

The strike, hurriedly called, was hurriedly terminated at midnight, Sunday, April 3. With parallel alacrity so ran the Georgia contempt proceedings including the trial on Monday, April 4. With all of the activity transpiring in the District of Columbia, much was happening down in Georgia. Early on Friday, April 1, 1966, the day after the temporary restraining order was issued by the Georgia District Court, Georgia Central and Southern petitioned for a rule to show cause why BLFE should not be held in criminal contempt.[9] It sought a show cause order under F.R.Crim.P. 42 (b) against BLFE, two named individual officers and all Firemen employees of Georgia Central as a class.[10] By separate order the Court appointed the Carriers' attorneys[11] to prosecute the criminal contempt, and on their application entered a formal, but uninformative show cause order.[12]

8. Demonstrating the utter lack of need for this Georgia-back-up order were the intense activities in Judge Holtzoff's Court in the enforcement of his orders of March 28 and 31.

On Saturday, April 2, Judge Holtzoff, at the request of the Carriers, issued a rule to show cause why BLFE should not be held in contempt for violation of his two orders. Moving with dispatch, to *enforce* the orders—not punish for prior violation—Judge Holtzoff on that same day adjudged BLFE and its president in contempt and ordered them to pay coercive fines of $25,000 and $2,500, respectively, if the contempts were not terminated by 12:00 noon on April 3. (Op. ■ p. 574.) On Sunday, April 3, Judge Holtzoff issued another rule requiring BLFE to show cause on Monday, April 4, why the fines should not be increased. On April 4, the railroad strike terminated and Judge Holtzoff vacated the rule to show cause issued on April 3.

9. After reciting their status as plaintiffs, excerpts from the restraining order of Thursday, March 31, the service on March 31 by the marshal on Vice President McCollum, General Chairman Healan, one lodge (714) and several pickets, the charge of violation was in the most general language:

"Those named hereinabove and other defendants in Civil Action 1917 have persisted in their refusal to report for duty and have continued to participate in and otherwise aid and abet directly and indirectly the picketing, work stoppage, and other conduct specifically described in the complaint, which is causing employees of the plaintiffs to refuse to work and preventing said employees from working for plaintiffs, and interferes with the ability of plaintiffs to perform their transportation service to the public and to the United States Government as set out in the complaint, and some of them have publicly stated that they do not intend to comply with said order."

10. The prayer requested "that an order be issued instanter by the Court and served upon R. L. McCollum, A. B. Healan, the Brotherhood of Locomotive Firemen and Enginemen, the Local Lodges thereof named in Civil Action No. 1917, and all other employees of Central of Georgia Railway Company who are members of the class of defendants named in the complaint in Civil Action 1917, being all firemen and enginemen employed by Central of Georgia Railway Company, requiring them to appear * * * to show cause why they and each of them should not be brought before the Court to be tried, and upon conviction, punished for their contempt of the order of this Court."

11. Messrs. Charles J. Bloch, Wilbur D. Owens, Jr., L. J. Bennet, and John B. Miller.

12. After briefly reciting the Carriers' application (notes 9, 10 *supra*) and the Court's designation of the prosecutors (note 11 *supra*) the order simply stated:

"IT IS ORDERED that R. L. McCollum, A. B. Healan, the Brotherhood of Locomotive Firemen and Enginemen, the Local Lodges thereof named in Civil Action No. 1917, and all other employees of Central of Georgia Railway Company who are members of the class of defendants named in the complaint in Civil Action 1917, being all firemen and enginemen employed by Central of Georgia Railway Company, to show cause before me at the United States Courthouse in Brunswick, Georgia, on the 4th day of April, 1966, at 11:00 A.M., why they should not be convicted of criminal contempt and willful disregard of the orders of this Court and why they should not be punished as required by the applicable statutes."

On Friday, April 1, BLFE, McCollum and Healan were served with a copy of the contempt show cause order (note 12, *supra*). Many others were served, some of whom got both the restraining order and the contempt show cause order at the same time.[13] Under the show cause order (note 12, *supra*) the hearing on the criminal contempt citation was scheduled for Monday morning, April 4. The Court persisted in going on with the trial even though the strike had terminated at midnight Sunday, April 3. On the morning of April 4, 1966, attorneys for BLFE and other contempt defendants filed a motion for continuance with supporting affidavits that many had not been served until late Friday evening, April 1, and others as late as Saturday afternoon, April 2. It remains uncontradicted to this day, as the affidavit set forth, that the defendants had been unable to obtain counsel until Saturday, April 2. Moreover, counsel was unable to obtain a copy of the restraining order or the criminal contempt show cause order until late Saturday evening. The persons involved were scattered throughout the state of Georgia. And with the nationwide strike and all high union officials being preoccupied with it and the proceedings then moving swiftly before Judge Holtzoff (Op. [2]), counsel had much difficulty in communicating with clients to ascertain the facts. Counsel actually had only Sunday, April 3, in which to prepare for trial, which was inadequate for defense of such serious charges.

With no showing whatsoever why—with the strike over, all matters firmly in hand in Judge Holtzoff's Court including coercive civil contempt proceedings—there was any need to go forward on such notice, the Court nevertheless denied the continuance as well as the motion for a jury trial. Judgment came swift and fast on Tuesday, April 5, followed by the significant amendment of Wednesday, April 6.

Although we think it best that the far-reaching issue of mandatory jury trial in a criminal contempt case arising in the context of the Railway Labor Act ought to be reserved to a case inescapably calling for a resolution then and there, it is appropriate to state here that the problem is formidable with much on the Brotherhood's side. The problem turns on the "arising under this Act" term of § 11 of the Norris-LaGuardia Act, 29 U.S.C.A. § 111 (1940), 47 Stat. 72, now recodified in 18 U.S.C.A. § 3692 [14] to "arising under

13. The prosecutors' brief (p. 4, n. 3) states the time of service of the contempt show cause order as follows:

| Party | Date | Day | Time |
|---|---|---|---|
| BLFE | Apr. 1 | Friday | 4:50 P.M. |
| McCollum | Apr. 1 | Friday | 4:50 P.M. |
| Healan | Apr. 1 | Friday | 4:50 P.M. |
| Lodge 714 | Apr. 1 | Friday | 4:50 P.M. |
| Hartley (Chm. Lodge 714) | Apr. 1 | Friday | 4:50 P.M. |
| Lodge 801 | Apr. 2 | Saturday | 12:45 P.M. |
| Perkins (Pres. Lodge 801) | Apr. 2 | Saturday | 12:45 P.M. |
| * Lodge 724 | Apr. 2 | Saturday | —— |
| * O. C. Hall (Pres. Lodge 714) | Apr. 2 | Saturday | —— |
| * Eiland (Pres. Lodge 724) | Apr. 2 | Saturday | 3:00 P.M. |
| * Landrum (Sect. Lodge 724) | Apr. 2 | Saturday | —— |
| * Bryant (Chm. Lodge 724) | Apr. 2 | Saturday | —— |

* Indicates simultaneous service of the temporary restraining order.

14. 18 U.S.C.A. § 3692:
"In all cases of contempt arising under the laws of the United States governing the issuance of injunctions or restraining orders in any case involving or growing out of a labor dispute, the accused shall enjoy the right to a speedy and public trial by an impartial jury of the state and district wherein the contempt shall have been committed. This

the laws of the United States governing the issuance of injunctions * * * in any case involving or growing out of a labor dispute". The complications are a meld of the *United Mine Workers* [15] principle that the § 11 jury trial provision is unavailing in labor disputes to which the Norris-LaGuardia Act is not "applicable", the court-developed interplaying accommodation concept that § 4's positive withdrawal of Federal Court jurisdiction does not prevent injunctions to compel compliance with specific requirements of the Railway Labor Act,[16] and the nominally contrary notion that other provisions of the Norris-LaGuardia Act, notably § 8's clean hands doctrine, control the grant or denial of such permissible injunctive relief.[17]

The Government, through the United States Attorney General as court-invited amicus, sides unequivocally with the appealing Brotherhood's claim that history, language and purpose mandate a jury trial in criminal, if not civil, contempt proceedings involving Railway Labor Act permitted injunctions.[18] With two voices, if not two hearts, the Government "in the relation of Central of Georgia Railway Company and Southern Railway" [19] takes just the opposite view. Intriguing as the problem is, we think it best for us also [20] to defer ruling on it since in our view the contempt judgments must be vacated for other reasons.

On a consideration of the whole record we conclude that the proceedings did not

section shall not apply to contempts committed in the presence of the court or so near thereto as to interfere directly with the administration of justice, nor to the misbehavior, misconduct or disobedience of any officer of this court in respect to the writs, orders or process of this court."

15. United States v. United Mine Workers, 1947, 330 U.S. 258, 67 S.Ct. 677, 91 L. Ed. 884.

16. Brotherhood of R. Trainmen v. Chicago, River & Indiana R.R., 1957, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622; Virginian Ry. Co. v. System Federation No. 40, 1937, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789; Florida East Coast Ry. Co. v. Brotherhood of Locomotive Engineers, 5 Cir., 1966, 362 F.2d 482.

17. This led the D.C. Circuit in its supplemental opinion to declare the Holtzoff injunction invalid for noncompliance with § 8. See Op. [1] p. 613. The court rejected the notion that this contradicted the § 4 cases (see note 16 *supra*), Op. [1] pp. 613–614.

18. This Court, on seeing that counsel for the parties, not the United States Attorney, had been designated by the Judge to prosecute the contempt, (see note 11 *supra*) called on the Attorney General to brief and argue the criminal contempt appeal. This followed our rewarding experience in Clark v. Boynton, 5 Cir., 1966, 362 F.2d 992, in which, through court-requested intervention of the Attorney General, the misconceptions of District Court and all counsel in this

complex field of contempt were exposed for corrective action.

19. The orders (see notes 10, 11, 12 *supra*) used traditional terminology *e. g.* "on application of the United States ex rel. Central of Georgia * * *."

20. The jury trial issue was raised in the D.C. Circuit contempt case, Op. [2]. Although this was a civil, not criminal, contempt, that court analogized a *coercive* civil contempt fine to a criminal, punitive, contempt judgment to give the order invulnerability to appellate review of the intrinsic validity of the underlying injunction. See Op. [2] p. 583, and p. 581, and n. 31. This expanded the case into something exceeding a pure civil contempt fine situation and may have led the Supreme Court into its enigmatic deferral of review of the jury trial attack until "necessary." The Court vacated its earlier order denying certiorari and in a brief per curiam denied the writ on the ground that the case was not yet ripe for decision. (see note 5 *supra*).

On invulnerability see United States v. United Mine Workers, 1947, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884, recently revitalized in Walker v. City of Birmingham, 1967, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210.

Except as to discovery order contempts, Southern Ry. Co. v. Lanham, 5 Cir., 1969, 408 F.2d 348 (on motion for rehearing en banc, dissent) is not to the contrary. But for reconsideration of penalty where the underlying order has been found invalid, see Dunn v. United States, 10 Cir., 1968, 388 F.2d 511, 513.

**318**

meet the demands of due process as to notice and time.[21]

■ To begin in the beginning, the underlying petition filed by the Carriers' counsel (note 10, *supra*) which led to the show cause order (note 12, *supra*) did not even name specifically 6 of the individual appellants and all 3 of the local lodges found in contempt.[22] This was no technical omission curable or to be cured by an actual awareness of those whom the blunderbuss class action order (note 12, *supra*) was intended to drag in. The best proof of the real uncertainty, chaos and confusion, was this exchange to "arraign" the respondents when the motion for continuance was denied:

The Court:

" * * * so will you let the defendants come forward."

Mr. Crawford [Brotherhood counsel]:

"I don't know who the defendants are, sir. I never have ascertained that fact."

The Court:

"Well, it's high time you were finding out."

Mr. Crawford:

"That is what I've been trying to find out all morning, sir. In their language, they specify all employees, officers, etc., without naming them."

The Court:

"You name them, [Mr. Miller]."

Mr. Miller:

"Yes, sir, of course, I am going to name them when he gives me time."

The Court:

"When their names are called, just let them come forward and stand up."

The advice that it was "high time" was all right in itself. But it had better been addressed to the prosecutors, if not the Court itself. For with the almost limitless variety and extent of the punishment which can come from criminal contempt trials, it is not time enough to know who is being tried when the prosecutor calls out a name. Of course this hurt all. For this rubbed on more than these unnamed individuals (or lodges). Both McCollum and Healan and the National Brotherhood were charged in a representative capacity. Agency was working up and down, down and up. Under the loose charges asserted, the National respondents stood to be condemned for conduct of local persons. Who these were, just who did what and when was a mystery.

■ Of course this was but part and parcel of the untimeliness of this hearing. Although people were being served by marshals all across Georgia, there was not only uncertainty as to what was charged. In the pressure of the moments there was difficulty and delay in getting counsel. When employed, counsel could not get a copy of the petition and show cause order until late Saturday. This left only Sunday for preparation for a case that might have resulted in a million dollar fine (see *United Mine Workers*, note 15 *supra*). Considering the complex problems unfolding in this dynamic area of contempt[23] a working day—much less a Sunday—is too little time unless there was some real necessity. Unlike cases stressed by the prosecutors[24] including

21. See *e.g.*, Ballantyne v. United States, 5 Cir., 1956, 237 F.2d 657; Matusow v. United States, 5 Cir., 1956, 229 F.2d 335, 345–346; United States v. Balaban, N.D.Ill., 1939, 26 F.Supp. 491; Cooke v. United States, 1925, 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767; In re Oliver, 1948, 333 U.S. 257, 68 S.Ct. 499, 92 L. Ed. 682; Philippe v. Window Glass Cutters League of America, W.D.Ark., 1951, 99 F.Supp. 369.

22. Of those individuals and lodges fined (see note 2 *supra*) only McCollum and Healan were named. None of the lodges (items 4, 5, 6) or officials were named.

23. See, *e.g.*, Bloom v. Illinois, 1968, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522; Cheff v. Schnackenberg, 1966, 384 U.S. 373, 86 S.Ct. 1523, 16 L.Ed.2d 629.

24. United States v. Barnett, 5 Cir., 1963, 330 F.2d 369, on certification, 1964, 376 U.S. 681, 84 S.Ct. 984, 12 L.Ed.2d 23; Op. [2] (note 5 *supra*).

the processing of Judge Holtzoff's civil contempt throughout the weekend, each of which called for haste to *secure* compliance, here the strike had been terminated the night before. Now a proceeding whose goal is to vindicate the integrity of the Court—not to force a withheld compliance—could go forward with an efficient but unhurried deliberateness characteristic of criminal cases in which liberty and other punishment of people is at stake.

With conduct, action, and accountability intertwined in both directions among national and local officials, Brotherhood and local lodges, there was a need for the opportunity for an investigation beyond the activities of local persons in Georgia.[25]

As we look objectively at this record there is no doubt concerning the genesis of this due process deficiency. It flows directly from the fact that the governance of the whole criminal contempt proceeding was delivered into the hands of counsel for private parties, not the National Sovereign. This transcends the matter of competence, character and professional trustworthiness.[26] Indeed, it is the highest claim on the most noble advocate which causes the problem—fidelity, unquestioned, continuing fidelity to the client. For while we would readily agree on this record that none of these distinguished counselors would have perverted a demand of the law in the prosecution of these respondents simply because it was

detrimental to the interest of their railroad clients, the fact is that, continuing as they are in the related *merits,* case (note 4 *supra*) to the vigorous support of the Carriers' positions, they have a duty faithfully to assert every—the word is every—contention, refute every—the word is every—counter contention which they may legitimately and honorably do, which is disadvantageous to their carrier clients in this controversy. One such objective is to marshal and generate—through court orders if obtainable—pressures which will, or may, bring the Brotherhood earlier to book. To move fast, to get punitive orders which might put the Brotherhood in an awkward or disadvantageous position was therefore a desired goal on April 4. On the other hand, as prosecutors for the court,—*i. e.* the National Sovereign—there was an obligation to make sure that the respondents' rights were scrupulously preserved. No one would suggest now that in any way these fine lawyers submerged one interest over the other. But that is not the point. The point is that those conflicting claims of undivided fidelity present subtle influences on the strongest and most noble of men. The system we prize cannot tolerate the unidentifiable influence of such appeals.

 It is the experience of this Court that the National Sovereign, through its chosen law officers, should be in control of criminal contempt proceedings.[27] Only in this way can we have the

25. The D.C. Circuit required exploration into the facts concerning ability to comply. See Op. [2] p. 581.

Another problem was the meaning of the underlying restraining order which prohibited the *"unlawful* picketing and work stoppage." In view of Judge Holtzoff amending his March 28 order on March 31, there might be a serious question as to just what picketing was "unlawful". Did the Court intend to forbid all picketing? Or only such as might ultimately be determined to be permissible under the Railway Labor Act. This may, we admit, sound super-technical but so is so much of the folklore of the Railway Labor Act, and it was at least

worthy of considered exploration by counsel.

26. No possible whisper of a suggestion of a remote reflection on the counsel (note 11 *supra*) is intended or implied. The professional, personal competence and character of each of these distinguished Georgia lawyers is well known to this Court. It would have no hesitancy in committing to any or all of them under court-appointment the defense of the most difficult criminal case. The criticism is not directed to *them,* but rather to the *role* assigned them by the District Judge.

27. We did this in *Barnett, supra,* see United States v. Barnett, 5 Cir., 1963, 330 F.2d 369, for the certification to

assurances that the contentions, both factual and legal, of the prosecution are thought by responsible governmental officials to be the policy that the court should adopt. Nothing better illustrates the working of these than the spectacle of the United States speaking with two divergent voices on the jury trial issue (see notes 19 and 20 *supra,* and related text).[28]

We therefore vacate the judgment of conviction and the order (note 11 *supra*) appointing carrier counsel as prosecutors. On remand, the District Court, if it determines that the prosecution should go forward, should designate the United States Attorney and his Assistants. The case will be fresh for whatever motions or other proceedings are appropriate or required. Bearing certainly on the extent and nature of punishment to be imposed, if and when there is a retrial and second conviction, is the fact that the Holtzoff restraining order and injunction has now been declared invalid by the D. C. Circuit, and that is binding on the carriers here, for noncompliance with § 8 of the Norris-LaGuardia Act. See Part III, Supplemental Opinion, Op. [1] pp. 613–614. Of course, that Court was careful to point out, consistent with the invulnerability principle (note 20 *supra*), that by "saying that the restraining order was erroneously entered, we do not mean that would excuse a contemptuous violation." Op. [1] p. 614. But it would certainly bring into play for evaluation the principle that ultimate declaration of invalidity might have a powerful effect on the kind or extent of punishment, if any, to be meted out.[29]

Of course we intimate no opinion on whether further prosecution should be had or what the outcome in result or penalty should be. These are initially for the District Court starting anew.

Judgment vacated and remanded.

---

the Supreme Court, and in Clark v. Boynton, 5 Cir., 1966, 362 F.2d 992, 994. And our regular practice in frequent NLRB proceedings is to put the United States Attorney in charge together with representatives of the General Counsel's staff for technical assistance.

See, *e.g.,* In re Winn-Dixie Stores, Inc., 5 Cir., 1967, 386 F.2d 309, 312.

28. Had not this Court itself been apprehensive and called on the Attorney General for amicus briefs (see note 18 *supra*) the position of the "ex rel government" presumably would have been that advanced by the prosecutors. Of course, we would have been conscious of their position and would not have credited it as an authoritative "government" position. To acknowledge this obvious fact is to admit that acting as prosecutors, these lawyers were something both more and less.

29. See, *e. g.,* Hyde Constr. Co. v. Koehring Co., 10 Cir., 1968, 388 F.2d 501; Dunn v. United States, 10 Cir., 1968, 388 F.2d 511, after remand 382 U.S., 362, 86 S. Ct. 522, 15 L.Ed.2d 416 of the earlier decision 1965, 348 F.2d 643; in the 5th Circuit see, 1963, 324 F.2d 295; Stewart v. Dunn, 1966, 363 F.2d 591. See also Donovan v. City of Dallas, 1964, 377 U.S. 408, 414, 84 S.Ct. 1579, 1583, 12 L.Ed.2d 409, 414.