COMMONWEALTH vs. WENDELL J. TABOR, JR.

Plymouth. September 11, 1978. — December 13, 1978.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, LIACOS, & ABRAMS, JJ.

*Homicide. Robbery. District Attorney. Conflict of Interest. Waiver. Practice, Criminal,* New trial, Directed verdict, Duplicitous convictions. *Constitutional Law,* Waiver of constitutional rights. *Evidence,* Prior conviction.

Where the prosecutor in a criminal case against a defendant charged with murder was counsel for the victim's widow in a civil action under G. L. c. 258A which was pending at the time the criminal case was tried, in violation of c. 12, § 30, the defendant was entitled to a new trial. [814-820]

At a hearing on a defendant's motion to suppress statements made by him to the police, there was sufficient evidence to warrant the judge's finding that the defendant had voluntarily waived his right to remain silent. [820-822]

At a hearing on a defendant's motion to suppress statements made by him to the police, there was sufficient evidence to warrant the judge's finding that the defendant was repeatedly informed of his constitutional rights, including his right to have an attorney present, prior to his making a statement, and that he understood his rights and voluntarily waived them. [822-823]

At a criminal trial, the judge did not err in denying the defendant's motion to suppress a knife which he gave to the police after making certain statements to them where its seizure occurred before further interrogation which was found to be illegal. [823-824]

At the trial of a defendant charged with armed robbery and murder, there was sufficient evidence to warrant the denial of the defendant's motions for directed verdicts of acquittal. [824]

At the trial of a defendant charged with armed robbery and murder, the defendant's prior conviction for assault and battery with a dangerous weapon was admissible to impeach him under G. L. c. 233, § 21. [824-825]

Where a defendant was convicted of murder in the first degree and armed robbery and sentenced to concurrent terms of life imprisonment, the double jeopardy clause of the Fifth Amendment was not violated. [825]

INDICTMENTS found and returned in the Superior Court on October 1, 1975.

The cases were tried before *Lappin*, J. and motions for a new trial were heard by him.

*P. J. Piscitelli* for the defendant.

*Robert M. Payton*, Assistant District Attorney, for the Commonwealth.

ABRAMS, J. Pursuant to G. L. c. 278, §§ 33A-33G, the defendant Wendell J. Tabor, Jr., appeals his convictions of armed robbery and murder in the first degree of Francis X. Garrison. Tabor argues assignments of error concerning (1) the denial of his pretrial motion to suppress certain evidence; (2) the denial of his motions for directed verdicts on the armed robbery and felony-murder; (3) the admission of a prior criminal conviction of the defendant; and (4) the claim that the defendant's conviction of both murder in the first degree and armed robbery constitutes double jeopardy. He also argues as error the denial of a second motion for a new trial, based on newly discovered evidence of an alleged conflict of interest on the part of the assistant district attorney[1] by the representation of the widow in a claim for compensation as the widow of the victim of a violent crime under G. L. c. 258A. We conclude that the judge correctly denied the motion for a new trial, based on the arguments made by Tabor. However, the issue raised by the defendant's motion involves the apparently unintentional violation of a statute, G. L. c. 12, § 30. We think such a violation, even though unintentional, amounts to an error of law requiring a new trial. *Commonwealth* v. *Gibbs*, 4 Gray 146, 148 (1855).

We summarize the evidence. Garrison, a retired painting contractor, walked with a severe limp. He was seen with Tabor at a Store 24 in Brockton at approximately 2:45 A.M., on August 30, 1975, where Garrison was characterized as "obviously drunk."

---

[1] The assistant district attorney representing the Commonwealth in this court did not represent the Commonwealth at trial.

At the store, Garrison asked for a sandwich and two packs of cigarettes. He then handed Tabor a ten dollar bill and Tabor paid for the purchases with the money. The store manager handed the change ($7.81) to Tabor, and Tabor handed the money to Garrison. Garrison and Tabor then left the store. Garrison stumbled as he left the store but then was seen walking with Tabor along Belmont Street toward the center of town.

A few minutes later, Garrison's cry for help brought a passerby who found him bleeding from stab wounds. Police and an ambulance were summoned. Garrison was taken to Brockton Hospital, where he died as a result of his wounds.

Although Garrison had been seen carrying a substantial amount of money in his wallet late in the afternoon of August 29, no wallet was found in his possession at the hospital.[2] Moreover, no money was found in Garrison's pockets. Concealed in his shoes, however, were a twenty dollar bill and two one dollar bills.

On August 29, Tabor tried to obtain some money from the manager of a restaurant where he had worked for a short period of time. The manager refused and Tabor became belligerent and told the manager that he would "get money one way or another."[3] Nonetheless, early the next morning Tabor was seen at the restaurant with money.

Moreover, after the stabbing but before Tabor learned of Garrison's death, Tabor told a number of people that he had "made a big score the night before," that he "almost had to kill somebody to get it [money]," and that he "almost had to break somebody's head to get it [money]." Tabor paid his landlord $40, the day Garrison died.[4]

---

[2] Garrison's wallet had not been found at the time of trial.

[3] During the week before the killing, Tabor had attempted to borrow money from a number of people.

[4] At trial Tabor testified as to how he acquired the money. The resolution of conflicting testimony was for the jury. *Commonwealth* v.

The next day, the police talked to Tabor. He told them that he met Garrison on Main Street, that Garrison asked him (Tabor) where he (Garrison) could buy some cigarettes, and that Tabor gave Garrison directions to a store. Tabor said he decided to go to the store with Garrison because he (Tabor) thought he could get some money from Garrison.

He told the police that, after leaving the store, Garrison punched him and as a result Tabor then knocked Garrison down. Tabor said that when Garrison stood up, he hit him (Garrison) again. Tabor stated that when Garrison came at him a third time, he (Tabor) pulled a knife out of the sleeve of a heavy green jacket which he was wearing, stabbed him (Garrison) and left. Tabor admitted that, after the fight started, he could have left the scene without stabbing Garrison, but said that he "didn't run away from anything."

Tabor denied taking any money from Garrison. However, he told the police that at the time of the crime he was unemployed, and supported himself by panhandling. He also told the police that he usually carried a knife, that he wore the heavy green jacket to conceal the knife, and that he kept the knife in the sleeve of the jacket, secured by an elastic cuff. According to Tabor, he used the knife to "roll stiffs and to protect himself against queers."

The jury found Tabor guilty of both armed robbery and murder in the first degree.[5] The judge sentenced him to concurrent terms of life imprisonment for each offense.

1. *Motion for a New Trial.*

Approximately one month after his conviction, the defendant filed a second motion for a new trial[6] pursuant to

*Hoffer*, 375 Mass. 369, 377 (1978). *Commonwealth* v. *Amazeen*, 375 Mass 73, 81 (1978).

[5] The case was submitted to the jury on the issue of murder in the first degree both on the theory of felony-murder and murder with deliberate premeditation.

[6] The judge's denial of the defendant's first motion for a new trial is not the subject of this appeal.

G. L. c. 278, § 29. He alleged that "newly discovered evidence has revealed a conflict of interest" on the part of the assistant district attorney who prosecuted the case.

In support of his motion, counsel for the defendant filed an affidavit in which he stated that at the same time that the assistant district attorney prosecuted the defendant, the same assistant district attorney was representing the victim's widow in an action for compensation under G. L. c. 258A, as the widow of the victim of a violent crime. Counsel for the defendant also denied any knowledge of the alleged conflict of interest until June 9, 1976, sometime after the judge denied his first motion for a new trial. After hearing arguments of counsel,[7] the judge denied the defendant's motion for a new trial.

In his motion, the defendant claims that the assistant district attorney's representation of the widow in the civil action denied him a fair trial. He alleges that because the assistant district attorney failed to reveal his representation of the widow to the defendant during the trial, the defendant was foreclosed from a potentially fruitful area of cross-examination of the victim's widow and daughter during the trial. He further alleges that the fact that the assistant district attorney would be entitled to attorney's fees from the successful representation of the widow, see G. L. c. 258A, § 4, "bore directly on prosecutorial conduct and discretion." Therefore, the defendant concludes that he should have a new trial.

The Commonwealth agrees that the assistant district attorney who prosecuted the case was counsel for the widow in a civil action under G. L. c. 258A. It is agreed that this civil claim was pending at the time the criminal case was tried.[8] The Commonwealth also agrees that the

[7] For some unknown reason, the transcript of what was argued is not before us, but the Commonwealth does not contest the facts as stated in the defendant's motion and affidavit.

[8] The record reveals that the assistant district attorney filed the petition for compensation on November 25, 1975. The grand jury re-

assistant district attorney did not disclose his civil repre-
sentation of the widow to the court or to the defendant
prior to June 9, 1976.

The Commonwealth argues, however, that the civil
representation of the widow created no conflict of inter-
est. The Commonwealth further maintains that, even if
such representation was a conflict of interest, the defend-
ant points to no specific instances of "overreaching or
overzealousness" at trial. Therefore, the Commonwealth
contends, the defendant can show no actual prejudice
from the assistant district attorney's representation of
the widow. The Commonwealth concludes that the repre-
sentation of the widow by the assistant district attorney
in an action brought under G. L. c. 258A provides no
grounds for a new trial in the criminal proceedings, even
if it were "inappropriate."

As argued by the defendant, his motion does not war-
rant a new trial. The defendant's claim that knowledge
of the "conflict of interest" would have opened a new area
of cross-examination of the victim's widow at trial is with-
out merit. To the extent that the defendant did not cross-
examine the widow concerning whether or not she had
filed a claim under G. L. c. 258A, he was not precluded
from such inquiry.[9]

Next, the defendant relies on a series of cases involving
claims of ineffective assistance of counsel arising out of a
joint or dual representation by defense counsel to support
his assertion that the assistant district attorney's "con-
flict of interest" requires a new trial. See, e.g., *Common-
wealth* v. *Geraway*, 364 Mass. 168, 170-173 (1973); *United
States* v. *Donahue*, 560 F.2d 1039, 1040-1041 (1st Cir.

_____

turned the indictments against the defendant on October 1, 1975. The
trial proceedings began on May 18, 1976, and the jury returned their
verdicts on May 29, 1976. The assistant district attorney did not with-
draw as counsel for the widow in the civil action until June 14, 1976.

[9] General Laws c. 258A was enacted by St. 1967, c. 852, § 1. The
statute had been the law of the Commonwealth for some time prior
to this proceeding.

1977). The Commonwealth argues, and we think correctly, that these cases are inapplicable to a question of prosecutorial conflict of interest because each of them is grounded in a conflict of interest on the part of defense counsel which may have divided his loyalty to his client. See *Commonwealth* v. *Geraway, supra; United States* v. *Donahue, supra* at 1043. Compare *Commonwealth* v. *Davis, ante* 777, 782-783 (1978); *Commonwealth* v. *Wright, ante* 725 (1978); *Commonwealth* v. *Leslie, ante,* 647, 652-653 (1978); *id.* at 656-657 (Liacos, J., concurring). The Commonwealth argues that, even if the assistant district attorney's representation of the widow in the civil action created a "conflict of interest," the conflict does not divide the loyalties of the assistant district attorney, since "whatever conflict existed involved a purely unitary purpose, and not a situation in which a Counsel faced two distasteful alternatives in terms of dividing loyalties when clients assumed antagonistic postures." Accordingly, the Commonwealth argues, the defendant is not entitled to a new trial.[10]

However, in reviewing the defendant's claim we are confronted with an apparently unintentional violation of a statute.[11] General Laws c. 12, § 30, provides that "[n]o

[10] We do not decide the issue as framed by the Commonwealth. It is, however, well established that "[a] district attorney's professional responsibility is to seek justice—to protect the innocent as well as to convict the guilty. A private attorney, however, has an obligation to zealously represent his client and to seek to resolve all questions in favor of his client. Because the professional responsibilities of a district attorney and a private attorney differ, anytime a district attorney represents the victim in a civil suit at the same time that he is prosecuting the defendant, a conflict of interest exists." *Commonwealth* v. *Dunlap*, 474 Pa. 155, 158-159 (1977) (Roberts, J., dissenting). See also *Ganger* v. *Peyton*, 379 F.2d 709, 713 (4th Cir. 1967) (discussing possible conflicts). Moreover, when a prosecuting attorney represents the Commonwealth on the one hand, and on the other hand sues the Commonwealth for damages on substantially the same set of facts, it may at least appear to the public that he is serving "antagonistic" interests.

[11] This statute was not brought to the attention of the court below, and neither party appears to be aware of it. The issue of conflict of

prosecuting officer shall receive any fee or reward from or in behalf of a prosecutor for services in any prosecution or business to which it is his official duty to attend, nor shall he be concerned as counsel or attorney for either party in a civil action depending upon the same facts involved in such prosecution or business."

In *Commonwealth* v. *Gibbs*, 4 Gray 146, 147 (1855), we held that a violation of the statute required a new trial. In that case, the prosecuting attorney represented persons in civil actions involving the defendants and depending on the same set of facts. We ordered a new trial without regard to whether there was actual prejudice to the defendants and without regard to whether the prosecutor received any fee in the civil actions. We stated that "propriety and fitness" required a new trial because violation of the statute is "irregular" and amounts to legal error. *Id.* at 147-148.

Since the enactment of G. L. c. 12, § 30,[12] we have held that in criminal proceedings neither the public prosecutor nor any attorney assisting him could receive compensation from any private party. "In such cases the statute supposes that the prosecution will be conducted by the law officers, for their salaries, and without any other compensation whatever." *Commonwealth* v. *Knapp*, 10 Pick. 477, 481-482 (1830). See *Commonwealth* v. *Williams*, 2 Cush. 582, 585 (1849).

*Gibbs*, *Williams*, and *Knapp* express the policy of this Commonwealth that the office of the district attorney is to be administered "wholly in the interests of the people at large and with an eye single to their welfare." *Attorney Gen.* v. *Tufts*, 239 Mass. 458, 489 (1921). See *Common-*

---

interest having been raised, we consider it in light of the statute. The question is whether the denial of the defendant's motion for a new trial amounts to an error of law which we notice on our own. Cf. *Commonwealth* v. *Gibbs*, 4 Gray 146, 148 (1855).

[12] The statute was enacted by St. 1807, c. 18, § 2.

*wealth* v. *DeChristoforo*, 360 Mass. 531, 545-546 (1971) (Tauro, C.J., dissenting); *Smith* v. *Commonwealth*, 331 Mass. 585, 591 (1954). See also *Berger* v. *United States*, 295 U.S. 78, 88 (1935).

Further, we think it irrelevant that the defendant failed to show actual prejudice in his trial.[13] The legislative policy is clear,[14] as is our construction of the statute. The purpose of our statute is to guard the district attorney's office from private interests and from private influence. A prosecuting attorney's obligation is to secure a fair and impartial trial for the public and for the defendant. His obligation to the defendant in this regard is as great as is his obligation to the public. The district attor-

---

[13] "[I]t is almost impossible to establish actual prejudice because of the vast discretion which we entrust to the prosecutor." *Commonwealth* v. *Dunlap, supra* at 161. Moreover, our cases impose no requirement that actual prejudice be shown where the statute has been violated. See *Commonwealth* v. *Gibbs, supra* at 147-148. Cf. *Commonwealth* v. *Williams*, 2 Cush. 582, 585 (1849); *Commonwealth* v. *Knapp*, 10 Pick. 477, 481-482 (1830).

Jurisdictions with statutes similar to G. L. c. 12, § 30, have ordered new trials without any showing of actual prejudice to the defendant. See, e.g., *State* v. *Jensen*, 178 Iowa 1098, 1104-1105, 1108 (1917); *People* v. *Hillhouse*, 80 Mich. 580, 583 (1890); *State* v. *Basham*, 84 S.D. 250, 258-259 (1969). Cf. *Sinclair* v. *State*, 278 Md. 243, 255 & n.8 (1976) (new trial ordered absent statute); *People* v. *Jiminez*, 187 Colo. 97, 102 (1974) (judgment affirmed because defendant knew of conflict and "conceal-[ed] error during trial" from judge); *State* v. *Detroit Motors*, 62 N.J. Super. 386, 393-394 (1960). But cf. *State* v. *Williams*, 217 N.W.2d 573, 575 (Iowa 1974) (actual prejudice required in situation where it was not clear that the prosecutor had violated the Iowa statute). See also Idaho Code § 31-2606 (1948); Ill. Ann. Stat. c. 14, § 7 (Smith-Hurd 1963); Iowa Code § 336.5 (1977); Mich. Comp. Laws Ann. § 49.158 (1967); S.D. Compiled Laws Ann. § 7-16-16 (1978 Supp.). See generally Mills, The Practicing Prosecutor — Beset with Conflicts, 54 Ill. B.J. 606-609, 615 (1966).

[14] The available comment on the statute, St. 1807, c. 18, § 2 (now G. L. c. 12, § 30), states that: "The government has as great an interest in the acquittal of the innocent, as in the conviction of the guilty. The undue influence that might be prevented by the act proposed, is very obvious. The attorney of the Commonwealth, before the grand jury, and in the Court, ought to be as disinterested, and impartial, as the Judge who tried the issue."

ney is vital to the administration of justice and to the vindication of constitutional rights. In view of his great responsibilities, a district attorney may not compromise his impartiality. See *Attorney Gen.* v. *Tufts*, 239 Mass. 458, 489 (1921). See also *Smith* v. *Commonwealth*, 331 Mass. 585, 591 (1954). We therefore require a new trial.

We examine those assignments of error which are likely to raise issues at a new trial.

2. *Other Issues.*

a. *The motion to suppress.* Prior to trial, the defendant filed a motion to suppress statements he made to police, claiming that he was not properly advised that he had a right to have an attorney appointed to represent him prior to and during any interrogation, and that absent a clear understanding of this right there could be no valid waiver of his constitutional rights. In his motion, the defendant sought to have his statements suppressed, and also any physical evidence seized as a result of the incriminating admissions, particularly a green army-type jacket and a knife.

We summarize the judge's findings. On August 31, 1975, at approximately 1:45 P.M., the police went to Tabor's apartment in Brockton. There, a Brockton police officer read Tabor his constitutional rights from a "Miranda card." Tabor was advised "[t]hat he could remain silent; that anything he said could be used against him in court; that he had a right to be represented by a lawyer during any interrogation, and that if he could not afford to hire an attorney, one would be provided; that if he chose to speak, he could stop at any time and insist at that point on his right to a lawyer."

Some fifteen minutes later, at the Brockton police department, a lieutenant orally repeated the warnings to Tabor. The lieutenant then presented Tabor with a form containing information as to his rights. Although the form did not contain the statement that a lawyer would be provided if the defendant were unable to secure one at his own expense, the judge found that the lieutenant

wrote that information on the form and then handed the form to Tabor, who read it. Tabor signed the form, which recited the fact that it was signed voluntarily. He then made an oral statement.

A subsequent statement made by Tabor was recorded by a stenographer. The recorded statement indicates at its outset that the police had informed Tabor of his constitutional rights earlier, and then repeated the so called "Miranda warnings" before taking the recorded statement.[15]

The judge found that Tabor made a knowing and intelligent waiver of his rights. He further found that near the end of the recorded statement Tabor asked to speak with a lawyer, and that thereafter the police asked four questions which Tabor answered.[16] The judge suppressed the last four questions and answers and any evidence seized as a result of the four questions and answers. The motion to suppress was denied as to all other statements and as to any evidence found as a result of the earlier statements. The defendant duly excepted to the denial of the major part of his motion.

---

[15] Although the judge did not make an explicit finding, the transcript marked as an exhibit indicates that the defendant was twice asked if he understood his rights. Each time he said that he understood his rights and wished to talk with the police.

[16] The four questions and answers were:

THE POLICE: "Would you have liked to talk to one before you gave us that story?"

THE DEFENDANT: "No, because I'm telling you the truth."

THE POLICE: "What did your girl say to you when you told her?"

THE DEFENDANT: "She asked me how I felt about it, she asked me if it bothered me."

THE POLICE: "Did she tell you to go to the Police about it?"

THE DEFENDANT: "About a minute after we were through talking about it she said, 'How could you be in such a good mood after doing something like that?'"

THE POLICE: "She knew after she read the paper, she knew you'd killed someone?"

THE DEFENDANT: "I showed her the article, she read it and that was it, ten minutes later she said, 'How could you be in such a good mood?' I said it didn't bother me."

The defendant does not deny that there was evidence to support the judge's finding that the defendant was repeatedly advised of his constitutional rights prior to making his statement to the police. However, he claims that the judge's ultimate finding of a voluntary waiver is erroneous because the testimony before the judge was conflicting and the evidence supporting a finding of voluntary waiver is not "credible."

"In reviewing a trial judge's determination that a voluntary waiver was made, the judge's subsidiary findings will not be disturbed, if they are warranted by the evidence, and his resolution of conflicting testimony will be accepted." *Commonwealth* v. *Santo*, 375 Mass. 299, 303 (1978). *Commonwealth* v. *Mahnke*, 368 Mass. 662, 666 (1975), cert. denied, 425 U.S. 959 (1976). While the defendant correctly argues that the judge's ultimate findings and conclusions of law are open for this court to review, see, e.g., *Commonwealth* v. *Santo*, *supra* at 303 a finding of voluntary waiver is "entitled to substantial deference by this court." *Commonwealth* v. *White*, 374 Mass. 132, 138 (1977), aff'd, 439 U.S. 280 (1978). *Commonwealth* v. *Roy*, 2 Mass. App. Ct. 14, 19 (1974). See *United States* v. *Springer*, 460 F.2d 1344, 1348-1349 (7th Cir.), cert. denied, 409 U.S. 873 (1972). The defendant claims that the credibility of the evidence on the issue of voluntary waiver makes the judge's ultimate conclusion of a voluntary waiver erroneous. Tabor essentially argues that the weight of the evidence is against the ultimate finding of voluntary waiver. Not only is this not borne out by the record, but also it is clear that "[w]e cannot properly be asked . . . to review the weight of the evidence related to the findings" made by the judge. *Commonwealth* v. *Valliere*, 366 Mass. 479, 486 (1974), quoting from *Commonwealth* v. *Murphy*, 362 Mass. 542, 550 (1972) (Hennessey, J., concurring).

Next the defendant argues that he did not understand his right to have appointed counsel present at his interrogation. He points to his expression near the end of his

recorded interrogation of a desire to see an attorney as
evidence that he did not understand his rights prior to
that time. However, a request to meet with counsel near
the end of interrogation is not inconsistent with a know-
ing and intelligent waiver as to statements made before
the request. See *Commonwealth* v. *Roy, supra* at 20;
*United States* v. *Alexander*, 441 F.2d 403, 404 (3d Cir.
1971). Moreover, it is for the judge to determine whether
the defendant's testimony that he did not understand his
rights is to be believed in light of the conflicting testimo-
ny offered by other witnesses at the hearing. See, e.g.,
*Commonwealth* v. *Santo, supra* at 303-304.[17]

We think there was more than ample evidence to sup-
port the judge's findings that the defendant was repeated-
ly informed of his rights before making any statement to
the police, and that the defendant understood his consti-
tutional rights and voluntarily waived them.

Finally, the defendant moved to suppress a knife and
a jacket seized by the police as a result of his statements.
He argued to the judge that the knife and jacket should
have been suppressed because they were seized as a result
of an illegal interrogation.[18]

The defendant's testimony was that, after giving the
oral statement at the police department, he went with the
police to the car where the knife was located and removed
the knife himself. He then gave the knife to the police.
The defendant's statement also indicates that the knife
was taken long before the last four questions of the re-
corded statement. There was no error in not suppressing

_____

[17] The judge found Tabor to be both alert and bright. He had com-
pleted nine years of school, and was able to answer all questions asked
of him at the hearing "articulately and intelligently."

[18] The defendant argues to this court that a search warrant was
necessary for the seizure of the physical evidence from the car. This
argument was not made to the judge below. Thus we need not decide
it. See *Commonwealth* v. *Lewis*, 346 Mass. 373, 383 (1963), cert. denied,
376 U.S. 933 (1964). In any event, Tabor's recorded statement indicates
that he consented to the removal of the physical evidence from the car.

the knife, since its seizure was not tainted by any earlier illegality.[19] See *Commonwealth* v. *Amazeen*, 375 Mass. 73, 79 (1978).

b. *Directed verdict.* The defendant challenges the denial of his motions, made at the close of the Commonwealth's evidence, for directed verdicts of acquittal on the armed robbery and murder indictments. The facts set forth in the summary of facts,[20] *supra*, considered in their light most favorable to the Commonwealth and the permissible inferences therefrom, provide ample evidence from which the jury could find the defendant guilty of armed robbery and felony-murder.[21] See *Commonwealth* v. *Hoffer*, 375 Mass. 369, 377 (1978); *Commonwealth* v. *Clifford*, 374 Mass. 293, 296-297 (1978).

c. *Prior conviction of the cefendant.* The defendant claims that the Commonwealth should not have been allowed to use his prior conviction of assault and battery with a dangerous weapon to impeach him. The record of his prior felony conviction was admissible under G. L. c. 233, § 21. If a conviction is admissible under the statute, a judge may exclude it, but it is not error to admit it. See *Commonwealth* v. *Chase*, 372 Mass. 736, 750-751 (1977); *Commonwealth* v. *DiMarzo*, 364 Mass. 669, 680-683 (1974)

---

[19] Although the defendant argues that the jacket was illegally seized, it was not clear on the record whether the jacket seized by the police was taken from the car, or whether the defendant was wearing the jacket at the time of his arrest. In either case, the seizure of the jacket was proper, since it was either taken as the result of the defendant's entering the car himself, or it was seized incident to a valid arrest. See *Commonwealth* v. *Marsh*, 354 Mass. 713, 720 (1968); *United States* v. *Edwards*, 415 U.S. 800, 806 (1974). In any event, it does not appear that the jacket was seized as a result of the last four questions. Thus on the record before us it does not appear to be error to have admitted the jacket.

[20] We consider only the evidence introduced up to the time the Commonwealth rested its case. *Commonwealth* v. *Amazeen*, 375 Mass. 73, 79-80 (1978). *Commonwealth* v. *Kelley*, 370 Mass. 147, 149-150 (1976).

[21] The defendant does not challenge the submission to the jury of the murder indictment on the issue of deliberate premeditation.

(Hennessey, J., concurring); *Commonwealth* v. *West,* 357 Mass. 245, 249 (1970).

d. *Double jeopardy.* The defendant claims that his convictions of murder in the first degree and armed robbery, for which he was sentenced to concurrent terms of life imprisonment, constitute multiple punishment for the same offense and thereby violate the double jeopardy clause of the Fifth Amendment to the United States Constitution. Where, in a single proceeding, a defendant is convicted of two offenses, one of which is an essential element of the other, and he is sentenced to concurrent terms, the double jeopardy clause is not violated. See *Brown* v. *Ohio,* 432 U.S. 161, 165 (1977). Cf. *Commonwealth* v. *Stewart,* 375 Mass. 380, 393 (1978).[22]

The denial of the defendant's second motion for a new trial is reversed, the judgments are reversed, the verdicts are set aside, and the case is remanded for a new trial.

*So ordered.*

---

[22] We need not decide whether consecutive sentences are permissible if the verdict on the murder indictment clearly shows that the accompanying felony was not an essential element of the jury's verdict on the murder indictment. See *Brown* v. *Ohio,* 432 U.S. 161, 166 (1977); *Morey* v. *Commonwealth,* 108 Mass. 433, 434 (1871). Compare *Harris* v. *Oklahoma,* 439 U.S. 970, 972 (1978) (Brennan, J., dissenting). Nor need we decide whether self-defense is available to a defendant tried solely on a theory of felony-murder. See, e.g., *Commonwealth* v. *Maguire,* 375 Mass. 768, 732-733 (1978); *Taylor* v. *United States,* 380 A.2d 989, 994 (D.C. 1977).