COMMONWEALTH *vs.* JAMES N. ELLIS, JR.
(and 104 companion cases[1]).

Worcester. January 4, 1999. - April 14, 1999.

Present: WILKINS, C.J., LYNCH, GREANEY, FRIED, & MARSHALL, JJ.

*Attorney General. Fraud. Insurance,* Fraud and concealment. *Conflict of Interest. Due Process of Law,* Conduct of prosecutor. *Practice, Criminal,* Indictment.

Description of the legislative scheme for the investigation, financing, and prosecution of insurance fraud. [364-366]

Discussion of cases considering the requirement that a prosecutor of criminal cases be disinterested [366-370], and statement of that standard [372].

The legislative scheme for the investigation, financing, and prosecution of insurance fraud does not violate the due process clause of the Fourteenth Amendment to the United States Constitution or any provision of the Massachusetts Declaration of Rights, where the assistant attorneys general prosecuting certain fraud cases were in fact impartial [370-372, 375-377]; further, the statutory scheme did not create even an appearance of impropriety [372-375].

Where the record of criminal proceedings for insurance fraud raised no suggestion that the prosecuting assistant attorneys general were other than disinterested, the judge correctly denied the defendants' motion for an evidentiary hearing to seek to prove that the prosecutors' exercise of discretion to prosecute was improperly influenced. [377-378]

INDICTMENTS found and returned in the Superior Court Department, forty-two on March 18, 1997, and sixty-three on September 12, 1997, respectively.

A motion to dismiss was heard by *Robert H. Bohn, Jr.,* J., and an alternative motion to report questions of law to the Appeals Court was heard by him.

The Supreme Judicial Court granted an application for direct appellate review.

[1] Eight indictments against James N. Ellis, Sr.; twenty-eight indictments against Nicholas J. Ellis; ten indictments against Helen D. Biliouris; fifteen indictments against Martha J. Porcaro; two indictments against Ronald G. D'Auteuil; and forty-one against James N. Ellis, Jr.

*Max D. Stern* (*Patricia L. Garin & Edward P. Ryan, Jr.,* with him) for the defendants.

*Erin K. Olson,* Assistant Attorney General,. for the Commonwealth.

The following submitted briefs for amici curiae:

*Alan B. Morrison,* of the District of Columbia, *John Reinstein, & Josh Friedes* for Public Citizen, Common Cause of Massachusetts & another.

*Mark S. Mandell & Jeffrey R. White,* of the District of Columbia, for Association of Trial Lawyers of America.

*E. Michael Sloman & Michael B. Meyer* for Insurance Fraud Bureau.

*Kirk J. Nahra & Timothy Simeone,* of the District of Columbia, & *Maria Ollari* for Coalition Against Insurance Fraud.

*Steven H. Schafer, Frank C. Corso, Peter J. Perroni, John J. St. Andre, Camille F. Sarrouf, & Martin W. Healy* for Massachusetts Academy of Trial Attorneys & another.

*Barbara Bergman,* of New Mexico, *Matthew H. Feinberg, & Matthew A. Kamholtz* for National Association of Criminal Defense Lawyers & another.

WILKINS, C.J. The matter before us involves the question whether or not the Attorney General's office is a disinterested prosecutor and, therefore, the indictments against the defendants should have been dismissed, or, alternatively, the Attorney General's office should be disqualified from prosecuting the indictments. Each defendant was a partner, of counsel, an employee, or a client of the former Worcester law firm of Ellis & Ellis, and each is charged with insurance fraud and related offenses. The firm represented plaintiffs in workers' compensation and personal injury cases. The defendant, James N. Ellis, Jr., moved to dismiss the indictments against him, in a motion which the other named defendants joined, based on the partiality of the attorneys prosecuting the cases. The judge who denied the motion to dismiss or to disqualify reported the propriety of his ruling to the Appeals Court, and we granted the parties' applications for direct appellate review.[2]

The defendants contend that the statutorily prescribed fund-

---

[2]In *Matter of Ellis,* 425 Mass. 332 (1997), we upheld an order that temporarily suspended the defendants James N. Ellis, Jr., and Nicholas J. Ellis from the practice of law. We held that the defendants' claim that the Attorney

ing scheme for insurance company underwriting of the costs of investigations and prosecutions conducted by the insurance fraud division of the Attorney General's office is unconstitutional, on its face and as applied. They claim a violation of the due process clause of the Fourteenth Amendment to the United States Constitution and of provisions of the Massachusetts Declaration of Rights. In support of their claim that the Attorney General's office must be and is not a disinterested prosecutor, they assert that insurance companies pay the salaries and benefits of assistant attorneys general in the insurance fraud division (as well as certain litigation expenses), that those attorneys must devote their full time to cases referred to the division by the insurance fraud bureau (IFB), a statutorily authorized investigation agency financed by insurers, and that there is an unacceptably close relationship between the IFB and the Attorney General's office which permits the IFB improperly to influence the prosecutorial process.

The Superior Court judge concluded that the defendants had not shown that any insurance organization had a controlling influence over the discretionary prosecutorial decisions of the insurance fraud division. He accepted all the defendants' asserted subsidiary facts as true and denied the defendants' request for an evidentiary hearing.

We shall first describe the plan that the Legislature proposed for the investigation, financing, and prosecution of insurance fraud. Next, we shall set forth the law that bears on the requirement of a disinterested prosecutor. We shall then analyze the facts in relation to the law and shall conclude that the legislative scheme does not on its face violate the defendants' rights. Finally, we shall consider and reject the defendants' claim that the way in which the insurance fraud program was operated violated their constitutional rights and common-law requirements that we have established concerning the independence of prosecutors. We shall also conclude that the circumstances did not require granting the defendants an evidentiary hearing during which they could seek to prove IFB's improper control over prosecutorial decisions.[3]

1. The Legislature has prescribed a plan for the investigation

General was not a disinterested prosecutor was not relevant to the discipline proceeding. *Id.* at 340.

[3]Quite apart from any constitutional or common-law principles concerning disinterested prosecutors, the defendants ask us to exercise our constitutional

and prosecution of insurance fraud crimes. It has authorized the creation of an entity, the IFB, to investigate charges of fraudulent insurance transactions and to refer any violation of law regarding insurance fraud to the appropriate prosecutor. St. 1996, c. 427, § 13. The Legislature has also established a mechanism for paying the Commonwealth for certain costs of insurance fraud investigations and prosecutions in the office of the Attorney General and has required the appointment of assistant attorneys general who must devote full time to the investigation and prosecution of insurance fraud matters. St. 1991, c. 399, § 3, as amended by St. 1995, c. 38, § 210.

The Automobile Insurance Bureau (AIB), licensed under G. L. c. 175A, § 8, and the Workers' Compensation Rating and Inspection Bureau (WCRIB), licensed under G. L. c. 152, § 52C, are authorized to create an insurance fraud bureau for the prevention and investigation of fraudulent insurance transactions. St. 1996, c. 427, § 13. The IFB, which was created pursuant to that authorization, is governed by a board of fifteen members, five from the governing committee of each rating bureau and five public officials.[4] § 13 (*a*). The executive director of IFB is directed to ensure that appropriate resources "are dedicated to the investigation of . . . fraudulent insurance transactions." § 13 (*b*). Costs of administration of the IFB are borne equally by the two rating bureaus. § 13 (*c*). Authorized IFB personnel have access to various information and records, if relevant to an IFB investigation and if used solely for IFB purposes, such as Department of Revenue records and certain criminal offender record information. § 13 (*d*).

Every insurer "having reason to believe that an insurance transaction may be fraudulent" must so advise the IFB. § 13 (*e*). The IFB must review each report and may undertake any appropriate further investigation. Whenever IFB's executive director is satisfied that a material fraud, deceit, or intentional misrepresentation has been committed in an insurance transaction, he must "refer the matter to the attorney general, the appropriate district attorney or the United States attorney [and to

---

superintendence over the operation of the courts and the conduct of attorneys in the courts to disqualify the Attorney General's office and to require the suppression of evidence.

[4]The Secretary of the Executive Office of Public Safety, the Director of Labor and Workforce Development, the Registrar of Motor Vehicles, the Commissioner of Insurance, and the Commissioner of the Department of Industrial Accidents.

appropriate licensing agencies]." § 13 (*h*). A person convicted of any law concerning insurance fraud, following an IFB referral for prosecution, "shall be ordered to make restitution to the insurer for any financial loss sustained as a result of such violation."[5] § 13 (*k*).

The Commissioner of Insurance (commissioner) must make annual assessments against the AIB and WCRIB. St. 1991, c. 399, § 3, as amended by St. 1995, c. 38, § 210. For fiscal year 1999, the appropriation from the general fund for the investigation and prosecution of automobile insurance fraud is $270,871, and the assessment against AIB toward that cost is $250,000. St. 1998, c. 194, § 2, line item 0810-0338. In that same year, the appropriation for the investigation and prosecution of workers' compensation fraud is $463,159 and the assessment against WCIRB toward that cost is $250,000. *Id.* at line item 0810-0399. The commissioner must also assess and collect from the rating bureaus an amount equivalent to funds expended from the general fund of the Commonwealth for fringe benefits "attributable to personnel costs of the attorney general's office related to the purposes for which [the annual] assessment is collected." St. 1991, c. 399, § 3, as amended by St. 1995, c. 38, § 210. The Attorney General must use the assessments "for the purpose of the investigation and prosecution of automobile insurance fraud matters and workers' compensation insurance fraud matters referred to" him by the IFB. *Id.* He must "designate at least six assistant attorneys general who shall devote full-time to the investigation and prosecution of automobile insurance fraud matters which are referred by said insurance fraud bureau, and shall designate at least seven assistant attorneys general who shall devote full-time to the investigation and prosection of workers' compensation insurance fraud matters which are referred by said insurance fraud bureau." *Id.*

2. There is no authority bearing on whether a prosecutor, acting pursuant to authorizing legislation, may properly prosecute a class of crimes involving an industry that indirectly provides funds to support those prosecutions. There is considerable authority concerning the impropriety of a prosecutor, or a prosecutor's client, having a substantial interest in the outcome

---

[5]The concept of restitution in the event of a conviction of insurance fraud is not unique to the statute with which we are concerned in the cases. See G. L. c. 152, § 14 (3); G. L. c. 266, §§ 27A, 108, 111B; G. L. c. 276, § 92A.

of the criminal proceedings. Much of that authority is not based on constitutional considerations. In the cases before us, however, the defendants must rest their main argument on constitutional grounds because the structure of the process that they challenge is prescribed by statute. It will be seen from our discussion of the authorities that there is no case in which a prosecutor was or should have been disqualified in circumstances similar to those of the cases before us. On the other hand, the circumstances of these cases are unique.[6]

In *Commonwealth* v. *Tabor*, 376 Mass. 811 (1978), the assistant district attorney who prosecuted a murder indictment was also counsel for the victim's widow who was seeking compensation, under G. L. c. 258A, as the victim of a violent crime. Relying on long-established principles stated in our cases as "the policy of this Commonwealth" (see *Commonwealth* v. *Knapp*, 10 Pick. 477, 481-482 [1830]; *Commonwealth* v. *Williams*, 2 Cush. 582, 585 [1849]; *Commonwealth* v. *Gibbs*, 4 Gray 146, 147 [1855]) and a statute originating in 1807 (St. 1807, c. 18, § 2), we ordered a new trial. *Id.* at 818-819. "A prosecuting attorney's obligation is to secure a fair and impartial trial for the public and for the defendant. His obligation to the defendant in this regard is as great as is his obligation to the public. The district attorney is vital to the administration of justice and to the vindication of constitutional rights. In view of his great responsibilities, a district attorney may not compromise his impartiality." *Commonwealth* v. *Tabor, supra* at 819-820. The prosecuting attorney's financial interest — his representation of the widow in her claim as a crime victim — alone was a sufficient ground for reversal of the conviction, and the defendant did not have to show that he was prejudiced in his trial. *Id.* at 819. See *Young* v. *United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 811-812 (1987) (plurality opinion); *Ganger* v. *Peyton*, 379 F.2d 709, 714 (4th Cir. 1967) (violation of due process clause of Fourteenth Amendment); *Sinclair* v. *State*, 278 Md. 243, 255 n.8 (1976) (violation of State policy); *People* v. *Zimmer*, 51 N.Y.2d 390, 395 (1980) (violation of

[6]Other States have insurance fraud units or divisions funded by insurers. See, e.g., N.J. Stat. Ann. § 17:33-8 (West 1994 & Supp. 1998); R.I. Gen. Laws §§ 31-50-1 & 31-50-4 (1994 & Supp. 1997). Each division in other States that has an investigatory function is a public agency and not a private entity. The IFB is supervised by public officials who serve on its board, but they represent a minority of board members.

State policy); *Commonwealth* v. *Eskridge*, 529 Pa. 387, 392 (1992) (violation of State policy); *Cantrell* v. *Commonwealth*, 229 Va. 387, 394 (1985) (State Constitution's due process provision violated).[7]

In *Young* v. *United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987), the Court held that counsel for a party that is the beneficiary of a court order may not serve as the prosecutor of criminal contempt charges for alleged violations of that order. *Id.* at 809. The Court reached its conclusion in the exercise of its supervisory authority over procedures in the Federal courts, and did not reach any constitutional issue.[8] *Id.* at 809 n.21 (Brennan, J., with whom Marshall, Blackmun, and Stevens, JJ., joined). *Id.* at 826 (Powell, J., with whom Rehnquist, C.J., and O'Connor, J., joined, concurring in the judgment in part, dissenting in part). "The concern that representation of other clients may compromise the prosecutor's pursuit of the Government's interest rests on recognition that a prosecutor would owe an ethical duty to those other clients." *Id.* at 804.

A prosecutor has considerable discretion, the exercise of which in most instances is outside the supervision of a judge. *Id.* at 807. See *Secretary of Admin. & Fin.* v. *Attorney Gen.*, 367 Mass. 154, 163 n.6 (1975), and cases cited. What would count as a disqualifying conflict of interest for a judge would not in certain situations disqualify a prosecutor. See *Young* v. *United States ex rel. Vuitton et Fils S.A.*, supra at 807, citing *Marshall* v. *Jerrico, Inc.*, 446 U.S. 238, 248 (1980). In the *Young* case, the conflict was not purely speculative because the prosecutor's simultaneous representation of an interested party was an inherent conflict that violated the ethics of the legal profession. *Young* v. *United States ex rel. Vuitton et Fils S.A.*, supra at 804 n.14, 807. See *Brotherhood of Locomotive Firemen & Enginemen* v. *United States*, 411 F.2d 312, 319 (5th Cir. 1969) (due process violated when "the governance of the whole criminal contempt proceeding was delivered into the hands of counsel for private parties").

---

[7]Similarly, the financial interest of a judge or of a judge's employer in the determination of a defendant's guilt violates due process. See *Ward* v. *Monroeville*, 409 U.S. 57 (1972); *Tumey* v. *Ohio*, 273 U.S. 510, 523, 531-532 (1927).

[8]In concurring, Justice Blackmun stated that the appointment of an interested party's counsel to prosecute for criminal contempt was a violation of due process. *Young* v. *United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 814-815 (1987) (Blackmun, J., concurring).

In *People* v. *Eubanks*, 14 Cal. 4th 580 (1996), the California Supreme Court considered the appropriateness of the recusal, ordered by a trial judge, of a district attorney's office from prosecution of the charges against the defendants. In that case, the victim of an alleged white-collar crime paid significant costs that the district attorney's office had incurred in investigating the crime. *Id.* at 585-587. Basing its decision solely on a California statute, and expressly eschewing any consideration of due process requirements (*id.* at 596 n.8), the court concluded that the district attorney's solicitation and acceptance of financial assistance from the victim of an alleged crime to pay investigation costs created a conflict of interest for the prosecutor (*id.* at 598).[9] The court noted that such a payment could raise a "question as to whether the wealth of the victim has an impermissible influence on the administration of justice." *Id.* at 593. "A system in which affluent victims, including prosperous corporations, were assured of prompt attention from the district attorney's office, while crimes against the poor went unprosecuted, would neither deserve nor receive the confidence of the public." *Id.* The court also commented that a prosecutor who had received financial assistance from a victim in paying his investigating expenses might be less willing than otherwise to drop the charges or to bargain for a lesser plea. *Id.* A prosecutor's discretionary choices must be unaffected by private interests. *Id.* at 597.[10]

Routine cooperation from a victim of a crime is, however, often necessary and should be encouraged. Victims of commercial or corporate crimes may assist the prosecution by collecting and organizing necessary information and even may

---

[9]The California statute required disqualification of a district attorney because of a conflict of interest only if the conflict "would render it unlikely that the defendant would receive a fair trial." Cal. Penal Code § 1424 (Deering 1992 & Supp. 1999). The statute's requirement of a showing of likely prejudice due to a conflict of interest may well impose a burden on a defendant that, as we have said above, due process considerations do not. The underlying criminal cases had been disposed of when the California court decided the *Eubanks* case, *People* v. *Eubanks*, 14 Cal. 4th 580, 596 n.8 (1996), and it did not have to face the question of a possible conflict between due process requirements and the statutory requirement of a showing that the trial was likely to be unfair.

[10]Although not expressed as a ground for the court's conclusion, the fact that the case concerned the possibility that a competitor of the victim corporation had stolen trade secrets may have increased the court's concern about the victim's funding the prosecutor's investigation.

properly hire private investigators for external investigation of suspected crimes. *Id.* See *International Business Machs. Corp.* v. *Brown,* 857 F. Supp. 1384, 1389 (C.D. Cal. 1994) ("this court sees no reason why those victims who have the resources and willingness to pursue their own investigation and enforce their own rights should be precluded either from doing so or from sharing the fruits of their efforts with law enforcement agencies"). "None of these common practices, however, include the district attorney's solicitation and acceptance of financial assistance to satisfy an already incurred obligation." *Eubanks, supra* at 598.

It is significant for our purposes that the California court distinguished (but did not pass on) the California statutory schemes for insurance industry funding of fraud prosecutions. *Id.* at 597. "The insurers involved in the statutory funding schemes are required by law to contribute to prosecution efforts." *Id.* "[T]he assessments are made industry-wide, rather than on one particular victim corporation, and are spent on investigation and prosecution of automobile and workers' compensation insurance fraud generally, rather than for the particular benefit of any one victim. These factors tend to reduce the likelihood any victim would gain, through financial contributions, influence over the conduct of any particular prosecution." *Id.*

The defendants assert a denial of both substantive and procedural due process under the Federal Constitution, although they state that their due process claim is better treated as procedural. We need not address which aspect of Federal due process is implicated, because we hold that the defendants have neither been deprived of a protected liberty interest nor subjected to conduct which "shocks the conscience" or violates fundamental fairness. See *Aime* v. *Commonwealth,* 414 Mass. 667, 673-675 (1993) (discussing differences between substantive and procedural due process analyses). See also *Marshall* v. *Jerrico, Inc.,* 446 U.S. 238, 249 (1980) (applying procedural due process analysis to claim of partial prosecution); *United States* v. *Lilly,* 983 F.2d 300, 309 (1st Cir. 1992) (applying substantive due process analysis to claim of partial prosecution). More specifically, we conclude that, whether or not the defendants have a right to an impartial prosecutor, the assistant attorneys general prosecuting their cases are impartial. Our analysis of the defendants' claims under the Massachusetts Declaration of Rights reaches the same conclusion.

Although there are situations in which this court has interpreted art. 12 of our Declaration of Rights as extending greater protection than parallel provisions in the United States Constitution (see, e.g., *Attorney Gen.* v. *Colleton*, 387 Mass. 790, 800 [1982]; *Jones* v. *Robbins*, 8 Gray 329 [1857]), our treatment of due process challenges to legislation has adhered to the same standards as those applied in Federal due process analysis. See *Trigones* v. *Attorney Gen.*, 420 Mass. 859, 864 (1995). The defendants also rely on other articles of the Declaration of Rights, but those articles, even where arguably applicable, do not prescribe an analysis more favorable to the defendants than that applied under concepts of due process. Article 5, which is set out in the margin,[11] provides that officers of government "are at all times accountable to [the people]." A prosecution is conducted in the interests of the Commonwealth, not on behalf of the victim. *Manning* v. *Municipal Court of the Roxbury Dist.*, 372 Mass. 315, 317-318 (1977). If, on a due process analysis, the Attorney General's office is not disqualified because of partiality or interest, the requirements of art. 5 would not be violated.[12]

Article 6, which appears in the margin,[13] prohibits the improper use of State power for private interests. See *Opinion of the Justices*, 354 Mass. 799, 801 (1968). The defendants argue that the sale of special access to, and the right to influence, public prosecutions would violate art. 6. However, the Legislature has indicated that the public interest in the prosecution of insurance fraud is a legitimate public benefit. See G. L.

---

[11]"All power residing originally in the people, and being derived from them, the several magistrates and officers of government, vested with authority, whether legislative, executive, or judicial, are their substitutes and agents, and are at all times accountable to them."

[12]Article 29, on which the defendants rely, for the first time on appeal, concerns not prosecutors but the impartiality and independence of judges and others authorized to decide the rights of litigants. See *Police Comm'r of Boston* v. *Municipal Court of the W. Roxbury Dist.*, 368 Mass. 501, 507 (1975).

[13]"No man, nor corporation, or association of men, have any other title to obtain advantages, or particular and exclusive privileges, distinct from those of the community, than what arises from the consideration of services rendered to the public; and this title being in nature neither hereditary, nor transmissible to children, or descendants, or relations by blood, the idea of a man born a magistrate, lawgiver, or judge, is absurd and unnatural."

c. 266, § 111A, and note 5 above. The defendants' claimed violation of art. 6 adds nothing to their State due process claim.[14]

We conclude that due process provisions of art. 12 require that a prosecutor be disinterested in the sense that the prosecutor must not be nor appear to be influenced, in his or her exercise of discretion, either by his or her personal interests or by a person or entity to whom the prosecution of a criminal case will or may bring significant benefits. We would reach the same conclusion as to the circumstances in which we would exercise our general constitutionally based superintendence authority over who may properly appear before the courts of the Commonwealth, generally and in specific cases. The standard of disinterestedness that we express may well be the same as that mandated by the Fourteenth Amendment. Our art. 12 based standard is at least to equal that mandate.

3. The defendants' claim that the Attorney General's insurance fraud division is not a disinterested prosecutor rests on the assertion that the relationship of that division with the IFB creates an appearance of impropriety. The statutory plan does not explicitly compromise the disinterestedness of the Attorney General's office. In their facial attack on the statutory scheme, which we consider in this section of this opinion, the defendants, therefore, must rely on the appearance from the statute itself that the Attorney General's office is not disinterested.[15] The question is whether there is such a degree of potential IFB influence inherent in the statutory pattern that constitutionally based considerations require that a court take some action to alleviate the problem. We conclude that there is no such influence inherent in the statutory plan.

The defendants rightly do not claim that victims of crimes may never assist prosecutors, financially or otherwise, in the investigation and prosecution of crimes. The cooperation of victims is often indispensible in presenting a case. It is in the public interest that victims and others expend their time, efforts,

---

[14]The defendants' reliance on art. 7 is misplaced. Article 7 speaks of the rights of the people to institute and change government. *Brookline* v. *Secretary of the Commonwealth*, 417 Mass. 406, 423 (1994). It does not concern challenges to statutory classifications.

[15]Similarly, in their as applied challenge to the manner in which the system has operated, as will be seen, the defendants have made no showing that the IFB or anyone else has improperly influenced the division's exercise of its authority.

and resources to aid public prosecutors. Many so-called white collar crimes are complicated transactions. Knowledgeable people are needed to detect and explain them. It would not serve the public interest to have a rule that inhibited close cooperation between prosecutors and victims. The important point is that, in the process, the prosecutor must retain total control over the course of the investigation and all discretionary decisions. A victim's direct funding of substantial expenses of a prosecutor's office would raise a question of control because, in such a case, the prosecutor may lose or appear to lose his impartiality because he may be beholden to the victim for assisting him. The defendants claim that the statutory scheme presents the same kind of problem.

The defendants' argument rests largely on the financial influence that they believe gives the IFB and the insurers such leverage over the exercise of prosecutorial judgment that the division cannot be independent and disinterested. The claim is that the division is compelled to pursue matters that the IFB refers to it that it would not have pursued in the normal course. The defendants argue also that the insurers can withdraw their financial support if the insurance fraud division does not respond to their interests and that this potential influence creates an unacceptable appearance that the Attorney General's office is not disinterested.

There is no merit to the claim that the insurance companies can control the system by withdrawing financial support. If companies were to decide to forgo the advantages of bureau membership and terminate those memberships in order to avoid funding the insurance fraud division, the Legislature could easily amend the statute to base assessments on premiums written or on some other standard.[16] Any threat of withdrawal of IFB funding would be an obvious paper tiger.

A related claim is that the assistant attorneys general, who by statute are directed to devote their full time to matters referred by the IFB, are inevitably obliged to act for the benefit of the IFB and its members and not as impartial prosecutors. The

---

[16]The defendants rely on the fact, if it is a fact, that a relatively few companies writing (not just authorized to write) motor vehicle or workers' compensation insurance are not members of either bureau and thus do not contribute to the cost of the IFB or the division. But payments of the bureaus' members to the bureaus are not voluntary. The IFB's payments pursuant to the statutory plan are mandatory.

defendants contend that the assistant attorneys general know that their jobs depend on continued IFB funding and, therefore, they will improperly favor IFB's interests. The Legislature appropriates funds for the compensation of assistant attorneys general, and the Attorney General appoints assistant attorneys general and determines their salaries. G. L. c. 12, §§ 2 & 10. The assistant attorneys general are treated no differently from others in the Attorney General's office. The job of an assistant attorney general in the insurance fraud division may be in jeopardy for poor performance, but, on a facial appraisal of the statutory plan, that threat is not attributable to the IFB.[17]

There is no force to the defendants' argument that the statutory plan operates for the financial benefit of insurance companies. Although there is a mandate in the statutory plan that a convicted defendant make restitution to the insurer for any financial loss sustained as a result of an insurance fraud that the IFB referred for prosecution, as would be true anyway pursuant to the General Laws (see note 5 above), whatever funds a company receives would have to be credited against reported losses in any rate filing (just as subrogation recoveries would be). More important is the fact that the Legislature did not devise this plan for the financial benefit of insurers but rather did so to face a serious problem of false motor vehicle and workers' compensation claims that inflate insurance premiums for insurance buyers. See *Automobile Insurers Bur. of Mass.* v. *Commissioner of Ins.*, 415 Mass. 455, 461-462 (1993) (discussion of the effect of fraudulent claims on insurance rates).[18] The process is designed to punish persons who make false claims and to inhibit others from making such claims.

Finally, the defendants assert that the structure of the statutory plan gives the IFB control over the Attorney General's decision-making function because the statute compels the insur-

[17]On an as applied analysis, the case for improper IFB influence over the designated assistant attorneys general fares even less well. Supervisory personnel, not compensated by the IFB even indirectly, review the work and pass on the recommended actions of those thirteen assistant attorneys general. We also know that the Attorney General has permitted the designated attorneys general to work on insurance fraud matters other than those that IFB has referred to the division. If that decision is contrary to the statutory direction, it is hardly a change to which the defendants may properly object.

[18]Of course, the active response of insurers to fraudulent claims will assist their case in support of rate filings, counteracting any claim that reported losses are inflated by fraudulent claims.

ance fraud division to investigate claims. The only obligation of the division is to review each IFB report. The statute leaves matters of further investigation and any decision to prosecute exclusively in the division's control.[19]

If we were confronted with a challenge to an arrangement between insurers and the Attorney General of the sort involved here that was not endorsed by statute, the appearance of the possibility of improper influence would be far clearer. Although statutory endorsement of an unconstitutional plan cannot make it constitutional, where the question is whether the appearance of an arrangement may support a determination of unconstitutionality, the fact that the Legislature has endorsed the plan, has supervisory authority over it,[20] and appropriates funds for it substantially changes appearances.

4. We now consider and reject the defendants' argument that the manner in which the statutory scheme has operated demonstrates that the insurance fraud division of the Attorney General's office is not disinterested. Here we must consider the facts established on the record. We utilize the motion judge's careful summary in his memorandum of decision and supplement it with facts from the record. Although there is a sharp disagreement about conclusions that should be drawn from the facts, there is little disagreement over specific facts.[21]

The IFB receives reports of suspected insurance fraud from a variety of sources. During IFB's first seven years, slightly more than one-half of these reports came from insurance companies. Other reports have come from governmental agencies, professional organizations, and the public.[22] Of the more than 12,800

---

[19]The division does not pursue one in seven of IFB's reports, a fact to be considered, of course, only in an as-applied analysis of the defendant's due process challenge.

[20]The IFB and the Attorney General must make reports to the Legislature every six months. St. 1996, c. 427, § 13 (*j*).

[21]In the next section of this opinion, we consider the defendants' claim that they were improperly denied an evidentiary hearing on their motion to dismiss.

[22]The investigation that led to indictments of the defendants was commenced on the basis of information received by the Attorney General (before the IFB was formed) from a Worcester County manufacturer that perceived a troublesome pattern of workers' compensation claims by employees represented by Ellis & Ellis. Other complaints followed, including concern expressed by the Department of Industrial Accidents. The law firm appeared to be the "common denominator" in various questionable workers' compensation claims.

reports received in those seven years, more than 5,000 were accepted for investigation, 64% of which were from insurance companies. Of the more than 5,000 cases investigated, approximately 1,200 were referred for prosecution to the office of the Attorney General (369), to the offices of various district attorneys (twenty-eight), and to the office of the United States Attorney (eleven).[23]

At various times, the then Attorney General, certain assistant attorneys general involved in the division's prosecution of cases before us, and the chief of the bureau supervising the division have attended IFB board meetings to share information and to discuss concerns (for example, prosecutorial delays and policy changes). After the IFB has referred a case to the division, information may be exchanged between them, and IFB investigators may continue to be involved during the division's investigation. In November, 1995, the Attorney General's office prepared a document that outlined the respective duties of the division and the IFB. Nothing in that document even hints at any obligation in the division to permit the IFB to control or participate in the exercise of prosecutorial discretion. On the other hand, the Attorney General referred to the relationship as "unique" and a "special private/public partnership."

In addition to the support that the division receives from legislative appropriations (which, of course, include amounts collected by statutory direction from the rating bureaus), the IFB provides in-kind support to assist the division with the investigation of cases assigned for prosecution.[24] The continued assistance of IFB personnel itself presents no problem. Cf. *Commonwealth* v. *Sbordone*, 424 Mass. 802 (1997) (recogniz-

---

[23]The other referred cases went to other State agencies or out-of-State law enforcement agencies.

[24]The motion judge summarized the assistance as follows:

"This assistance has consisted of obtaining documents, interviewing witnesses, serving subpoenas, providing charts and photographs, and arranging for handwriting and accident reconstruction experts. On occasion, IFB investigators have provided airline tickets or other travel reimbursement for out-of-state witnesses, and the IFB has given the Fraud Division computer software (the 'Excel' spreadsheet program) to assist it in tracking cases. As·specifically relates to this case, the IFB has reimbursed an assistant attorney general for his purchase of a 'Seagate' hard drive, has provided blank computer back-up tapes and an extension cord to assist the Fraud Division in its investigation and search of the computer system at the defendant's law firm, and has paid

ing that use of investigator from IFB to assist in search pursuant to warrant was appropriate in the circumstances). The reimbursement by IFB of an assistant attorney general for his purchase of a computer hard drive and of IFB's other financial assistance to the division directly related to these indictments are more problematic, but seem to fall into acceptable assistance, and to be minimal, unlike the reimbursement in *People* v. *Eubanks*, 14 Cal. 4th 580 (1996).

The defendants have not shown that the operation of the statutory scheme gives the IFB improper control or influence over the decisions of the insurance fraud division. Assistance in investigations and prosecutions does not translate into control, or, as we have said, even the appearance of control. The fact that the insurance fraud division does not investigate and prosecute fraud by insurance companies does not aid the defendants because another division in the Attorney General's office does. Nor does the special access to certain records granted to IFB by the Legislature in its discretion (St. 1996, c. 427, § 13 [*d*]) or the IFB's receipt of status reports from the division demonstrate that the office of the Attorney General is not a disinterested prosecutor.

5. The judge rightly denied the defendants' motion for an evidentiary hearing at which they would seek to prove "the extent to which prosecutors are encumbered by private interests and private influence." In deciding as he did, the judge assumed that all the defendants' subsidiary facts were true, "including the presence of the Office of the Attorney General's representatives at IFB meetings, the level of involvement of IFB investigators after referral, the IFB's provision of in-kind resources to the Fraud Division, the amount of money flowing indirectly from the AIB and WCRIB to the Office of the Attorney General by way of the legislative construct, and the Fraud Division's failure to prosecute an insurance company for fraud. None of these facts remain in doubt or dispute, nor are there any additional facts that are material to the resolution of this motion."

The defendants claim that they have been indicted because the IFB insisted that the Attorney General's office pursue them. The defendants fail to identify any real or potential leverage

the bill of the computer expert who assisted in setting up the Ellis & Ellis computer system in preparation for the Commonwealth's search."

that the IFB or any insurer had to force the Attorney General's office to abandon its independence and disinterest. The sheer volume of indictments and the origin of the complaints leading to the investigation (see note 22 above) tend to belie any argument that the decision to indict the defendants was improperly motivated or made pursuant to secret agreements between the Attorney General and the IFB. It is not wrong for a prosecutor to meet with an alleged victim or its representative to discuss progress in the investigation of a crime. Nor is an indictment impeachable because it was obtained after a victim had complained of delay in a prosecutor's investigation.

The record facts raise no suggestion that the Attorney General, the insurance fraud division, or any assistant attorney general was other than disinterested in the investigation and prosecution of the defendants. In the absence of such a demonstration, any inquiry into the reason why a prosecutor exercised his or her discretion to prosecute would be inappropriate. That in the performance of their duties they have zealously pursued the defendants, as is their duty within ethical limits, does not make their involvement improper, in fact or in appearance. See *Marshall* v. *Jerrico, Inc.*, 446 U.S. 238, 248 (1980).

6. Our conclusion that the defendants have not demonstrated that their constitutional rights have been or will be violated by the statutory pattern that they challenge should not be construed as our endorsement of the system as desirable. Because of the closeness of the IFB and the Attorney General's insurance fraud division, there is the possibility of private interests improperly influencing the exercise of prosecutorial discretion in a particular case.[25] The seemingly favored treatment of insurance fraud matters, financed initially by insurers and ultimately by consumers, over other criminal matters may be difficult to justify on policy grounds. Absent, however, a showing of a violation of constitutional rights or a demonstration that this court must step in to assure a fair trial, these considerations are not for us.

7. The order denying the defendants' motion to dismiss, to

[25]The motion judge referred to the financing scheme as fostering "a somewhat unusual level of intimacy" between the division and the IFB. "As a matter of public policy," he wrote, "such a relationship may not seem particularly desirable."

disqualify prosecuting counsel, and for other appropriate relief is affirmed.

*So ordered.*

FRIED, J. (concurring, with whom Lynch, J., joins). I agree with the court's judgment and with all of its opinion except Part 6. Once we have concluded that "the defendants have not demonstrated that their constitutional rights have been or will be violated" by this scheme, it really does not matter whether we "endorse[] the system as desirable." *Ante* at 378. We are not in the business of issuing or withholding such endorsements. Nor need anyone "justify" to us wholly lawful legislative schemes "on policy grounds." Indeed I can see quite good policy grounds for an arrangement that assures that criminality such as is charged here, which poses no threat of violence and has no obvious victims but still robs the public, will get sufficient prosecutorial attention to deter predators. But my views on that score are of no moment and I would not inject them into the decision of these cases.